# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

Nº 07 Civ. 318 (RJS)

————————————

CARLO DEBLASIO, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

VERSUS

MERRILL LYNCH & CO., INC., *et al.*,

Defendants.

————————————

OPINION AND ORDER
July 27, 2009

————————————

RICHARD J. SULLIVAN, District Judge:

In this putative class action, seven individual Plaintiffs bring claims under federal and state law, on behalf of themselves and all others similarly situated, alleging that five groups of banking entities engaged in "deceptive and misleading" practices relating to a series of "Cash Sweep Programs" that were offered as part of Plaintiffs' brokerage accounts. Plaintiffs bring claims for violations of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("IAA"), the Sherman Antitrust Act, 15 U.S.C. § 1, and New York General Business Law § 349 ("§ 349"), as well as common-law claims for fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment.

Before the Court are Defendants' five motions to dismiss Plaintiffs' claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motions are granted.

## I. BACKGROUND

The following information is derived from the Second Amended Complaint ("SAC"), the declarations and affidavits submitted by the parties in connection with Defendants'

motions, and the additional materials attached as exhibits thereto.[1] Plaintiffs' factual allegations are assumed to be true and all reasonable inferences are drawn in their favor. *See In re Ades & Berg Group Investors*, 550 F.3d 240, 243 n.4 (2d Cir. 2008).

## A. Overview

This action relates to a brokerage account feature known as a "Cash Sweep Program." This feature is offered to retail investors by each of the five groups of Defendant banks, which the Court refers to as the Merrill Lynch Defendants, the Morgan Stanley Defendants, the Citigroup Defendants, the Charles Schwab Defendants, and the Wachovia Defendants.[2] Through these Programs, Plaintiffs were offered the option of having the balance of uninvested funds in their brokerage accounts, known as a "free credit balance," placed in — or, "swept" into — other types of investments. (*See* SAC ¶ 1.)[3] As a result of these "sweeps," Plaintiffs earned interest on the otherwise-uninvested funds in their brokerage accounts. (*Id.*)

Plaintiffs allege that, when Defendants initially implemented the Cash Sweep Programs, their free credit balances were swept into money market mutual funds that provided interest rates of approximately five percent. (*See id.* ¶ 6.) In these original Cash Sweep Programs, "the profits obtained by Defendants . . . were limited in nature" and typically did not exceed an "expense ratio" of less than one percent of the principal. (*Id.* ¶ 65.)[4] Additionally, "since money market

---

[1]   In support of their separate motions to dismiss, Defendants submitted one joint memorandum of law, which the Court cites as "Defs.' Mem.," as well as individual memoranda for each group of Defendants, which the Court cites by specific reference to the relevant group of Defendants that submitted the brief. Plaintiffs submitted a single memorandum of law in opposition to Defendants' motions, which the Court cites as "Pls.' Mem."

No party has objected to the exhibits and attachments that were submitted to the Court for consideration in connection with Defendants' motions. Plaintiffs appended a substantial volume of such materials — including excerpts from websites, account-opening agreements, brochures, and public filings — to the five declarations of Joel P. Laitman (the "Laitman Declarations"), and they relied in their opposition papers on the materials that were submitted by Defendants. The Court has reviewed all of these materials, and the documents cited in this decision have been deemed to be integral to the SAC. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("In most instances . . . , [an integral document] is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls . . . ."). These materials are therefore appropriately considered in connection with the resolution of Defendants' motions. *See, e.g.*, *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[2]   The Court adopts this convention based on Plaintiffs' classification of Defendants into "five separate groups." (Pls.' Mem. at 1 n.2.) Plaintiffs' five Laitman Declarations are also arranged according to these groups. Thus, for example, the Court cites to the Laitman Declaration regarding the Merrill Lynch Defendants as "Pls.' Merrill Lynch Decl."

[3]   The regulations of the Securities and Exchange Commission ("SEC") define "free credit balances" as "liabilities of a broker or dealer to customers which are subject to immediate cash payment to customers on demand, whether resulting from sales of securities, dividends, interest, deposits or otherwise . . . ." 17 C.F.R. § 240.15c3-3(a)(8).   In the SAC, Plaintiffs provide an appropriately simple alternative definition: "uninvested cash." (*See, e.g.*, SAC ¶ 1.)

[4]   An "expense ratio" is calculated by dividing the total value of the assets that a mutual fund holds under management by the fund's total annual operating costs and service charges. *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540-41 (S.D.N.Y. 2008).   The figure, expressed as a percentage, represents the proportional service fee that a mutual fund charges to an investor based on the amount of the investment in the fund.

funds are maintained in a trust, those funds were unavailable for use by a brokerage firm to lend or invest in higher-yielding activities . . . ." (*Id.* ¶ 65 (emphasis omitted).)

According to Plaintiffs, Defendants subsequently modified their respective Cash Sweep Programs in a deceptive manner in an attempt to capitalize on "an immense opportunity for their own profit . . . ." (*Id.* ¶ 7.) In these modified Cash Sweep Programs, Defendants limited certain customers' ability to have their free credit balances swept into money market mutual funds, often according to the amount of assets deposited in the customers' brokerage accounts. (*Id.* ¶ 12.) Instead of mutual funds, many customers' free credit balances were swept into standard deposit accounts. (*See id.* ¶ 6.)

Plaintiffs allege that these modified Cash Sweep Programs provided between one and two percent interest on free credit balances, as opposed to the four to five percent interest that they had previously earned when their uninvested funds were swept into money market mutual funds. (*Id.*) Plaintiffs further allege that, by sweeping their free credit balances into depository accounts at affiliated banks, Defendants were able to "use their clients' uninvested cash for their own investment or commercial lending." (*Id.* ¶ 7.) Finally, Plaintiffs assert that, although Defendants significantly increased their profits through this modification to the Cash Sweep Programs, they "dramatically reduced the yields paid to their clients on the clients' uninvested cash . . . ." (*Id.* ¶ 9 (emphasis omitted).)

Plaintiffs contend that, in order to maintain the "massive profits" that resulted from these activities, Defendants concealed the modifications to their Cash Sweep Programs through a series of misleading statements and omissions. (*Id.* ¶ 18.) Plaintiffs argue that, as a result of this alleged fraudulent scheme, they were induced to remain enrolled in modified Cash Sweep Programs, despite the fact that there were more lucrative investments available for their uninvested free credit balances. Based on these allegations, Plaintiffs seek an unspecified amount of "damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial . . . ." (*Id.* ¶ 330(b).)

1. The Parties

Plaintiffs are seven retail investors who maintained brokerage accounts with one or more of Defendants at the time the SAC was filed; six hail from New York, and the seventh resides in North Carolina. (*Id.* ¶¶ 30-36.)[5] Plaintiffs bring claims on behalf of a putative class of "all those who maintained a brokerage account with one or more of the . . . Defendants where the clients' uninvested cash was automatically swept into a Defendant controlled and affiliated bank account paying interest below prevailing money market yields." (*Id.* ¶ 54.)

Plaintiffs name as Defendants five groups of banks, each of which includes three types of entities: (1) a principal banking entity that

---

[5]   Although the named Plaintiffs' accounts are discussed below, *see infra* Part I.B, no Plaintiff makes allegations regarding: (1) when his or her account was opened; (2) the value of the assets held in the account; (3) the history of the interest rates received through Defendants' various Cash Sweep Programs; or (4) whether he or she received or read the advertisements and disclosures described in the SAC.

functions as a parent firm (collectively, the "Parent Defendants"); (2) an affiliated broker-dealer subsidiary (collectively, the "Brokerage Defendants"); and (3) a series of affiliated subsidiaries that function as depository banks (collectively, the "affiliated Sweep Bank Defendants" or "affiliated Sweep Banks").

Parent Defendant Merrill Lynch & Co., Inc. is the parent of three wholly owned subsidiaries named in this action: Brokerage Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., and affiliated Sweep Bank Defendants Merrill Lynch Bank, USA and Merrill Lynch Bank & Trust Co., FSB (collectively, the "Merrill Lynch Defendants"). (*Id.* ¶¶ 38-40.)

Parent Defendant Morgan Stanley is the parent of three wholly owned subsidiaries named in this action: Brokerage Defendant Morgan Stanley & Co., Inc., and affiliated Sweep Bank Defendants Morgan Stanley Bank and Discover Bank (collectively, the "Morgan Stanley Defendants"). (*Id.* ¶¶ 41-43.)[6]

Parent Defendant Citigroup, Inc. is the parent to four wholly owned subsidiaries named in this action: Brokerage Defendant Citigroup Global Markets, Inc., and affiliated Sweep Bank Defendants Citibank N.A., Citicorp Trust Bank, FSB, and Citibank

(South Dakota) N.A. (collectively, the "Citigroup Defendants"). (*Id.* ¶¶ 44-46.)[7]

Parent Defendant Charles Schwab Corp. is the parent to three wholly owned subsidiaries named in this action: Brokerage Defendant Charles Schwab & Co., Inc., and affiliated Sweep Bank Defendants Charles Schwab Bank, N.A., and U.S. Trust Company, N.A. (collectively, the "Charles Schwab Defendants"). (*Id.* ¶¶ 47-49.)

Parent Defendant Wachovia Corp. is the parent to three wholly owned subsidiaries named in this action: Brokerage Defendant Wachovia Securities, LLC, and affiliated Sweep Bank Defendants Wachovia Bank N.A. and Wachovia Bank of Delaware, N.A. (collectively, the "Wachovia Defendants"). (*Id.* ¶¶ 50-52.)[8]

---

[6]   In April 2007, an entity known as Morgan Stanley DW, Inc. merged into Morgan Stanley & Co., Inc. (*See* SAC ¶ 42.) Prior to the merger, Morgan Stanley DW, Inc. acted as the principal broker-dealer for Parent Defendant Morgan Stanley. (*Id.*) Following the merger, Morgan Stanley & Co., Inc. assumed that role. (*Id.*)

[7]   The Citigroup Defendants assert that, although Plaintiffs named "Citigroup Global Capital Markets, Inc." as a Defendant in the caption of the SAC, the name of Citigroup's principal broker-dealer is Citigroup Global Markets, Inc. (Citigroup Mem. at 1 n.1.) The Citigroup Defendants further assert that "Smith Barney," which is referred to in the SAC as a separate entity (*see, e.g.*, SAC ¶ 45), is merely "a division and service mark of [Citigroup Global Markets, Inc.]." (Citigroup Mem. at 1 n.1.) These distinctions appear to be immaterial to the resolution of the instant motions. Accordingly, the Court refers to this group of Defendants collectively as the Citigroup Defendants, and adopts Plaintiff's identification of Smith Barney as a separate broker-dealer entity affiliated with the Citigroup Defendants.

[8]   Defendant Wachovia Corp. is the successor entity arising out of the September 1, 2001 merger of First Union Corporation and the former Wachovia Corporation. (*See* SAC ¶ 50.) Defendant Wachovia Securities has an intermediate parent entity known as Wachovia Financial Holding, LLC, which is a joint venture between Wachovia Corp. and Prudential Financial Inc. (*See id.* ¶ 51.)

2.  The Evolution of the Cash Sweep
Programs

Plaintiffs' allegations relate to the manner in which Defendants implemented three successive phases of their respective Cash Sweep Programs, which the Court refers to as the "Original Cash Sweep Programs," the "Modified Cash Sweep Programs," and the "Tiered Cash Sweep Programs."

a.  The Original Cash Sweep Programs

Beginning in 1977, Defendants began to offer retail investment accounts that included both brokerage services and "bank-like features." (*Id.* ¶ 64.) The Original Cash Sweep Programs were one of the defining features of these types of accounts. (*See id.*) Through these Programs, Defendants used customers' free credit balances to purchase shares of money market mutual funds for those customers on a periodic basis, but still allowed the customers to write checks drawing on the swept funds. (*Id.*; *see also id.* ¶ 7.)

Plaintiffs allege that, "[u]ntil the late 1990s," the Original Cash Sweep Programs allowed customers to "receive the benefit of money market rates while also maintaining the [free credit balances] in safe and highly liquid investments." (*Id.* ¶ 65.) However, the profits earned by Defendants in connection with the Original Cash Sweep Programs were "generally small" and limited to an "'expense ratio' that [was] . . . less than 1% of the principal." (*Id.*) Plaintiffs further allege that, because the money under the control of a money market mutual fund is held in trust for the benefit of the fund's shareholders, Defendants were not permitted to use their customers' swept funds to raise profits

through their other commercial activities. (*See id.*)

b.  The Modified Cash Sweep Programs

Beginning in 1997, the Brokerage Defendants began to implement the Modified Cash Sweep Programs. (*Id.* ¶ 66.) In these Programs, the Brokerage Defendants offered customers an alternative to the Original Cash Sweep Programs in which they could have their free credit balances swept into FDIC-insured deposit accounts at affiliated Sweep Banks. (*Id.*) Plaintiffs allege that, although such deposit accounts traditionally pay lower interest rates than money market mutual funds, many of the Brokerage Defendants initially provided interest rates that were similar to the rates that customers had previously received in the Original Cash Sweep Programs. (*Id.*)

However, Plaintiffs assert that, at some point after implementing the Modified Cash Sweep Programs, "it became irresistible to the Defendants to pay [their customers] *substantially lower* rates" on funds deposited at affiliated Sweep Banks and "to *restrict* access to alternative money market sweep accounts . . . ." (*Id.* (emphases in original).) In response to this incentive, Defendants allegedly "dramatically reduced the yields paid to their clients on the clients' uninvested cash to well below money market yields — to even as low as less than 1%." (*Id.* ¶ 9 (emphasis omitted).)

Plaintiffs allege that, at the same time that Defendants began to pay their customers lower interest rates on their free credit balances, Defendants were seeking to enhance their own profits. (*See id.*) Specifically, as part of the Modified Cash Sweep Programs,

when customers' funds were deposited at affiliated Sweep Banks, Defendants were able "to use their clients' uninvested cash for their own investment or commercial lending." (*Id.* ¶ 7.) These commercial endeavors allegedly resulted in substantially higher returns than Defendants received through the Original Cash Sweep Programs, and Plaintiffs assert that the net result of the transition to the Modified Cash Sweep Programs was that Defendants "reap[ed] massive profits at their clients' expense . . . ." (*Id.* ¶ 11.)

### c. The Tiered Cash Sweep Programs

In approximately June 2001, Defendants began to introduce the Tiered Cash Sweep Programs. (*Id.* ¶ 67.) In the Tiered Cash Sweep Programs, Defendants classified their customers according to "tiers" based on the amount of assets held in their brokerage accounts, and offered progressively lower interest rates on free credit balances to customers in the tiers with fewer assets. (*See id.*)

Plaintiffs allege that Defendants subsequently made further changes to the structure of the Tiered Cash Sweep Programs so that customers in the bottom asset tiers were *precluded* from having their free credit balances swept into money market mutual funds. (*See id.*) In these versions of the Tiered Cash Sweep Programs, some customers were forced to choose between either depositing their free credit balances at affiliated Sweep Banks, or not earning a profit on the uninvested funds in their accounts. (*See id.*)

The Tiered Cash Sweep Programs were allegedly designed to maximize Defendants' financial benefits by taking advantage of the retail brokerage customers who held the least amount of assets in their accounts. (*See id.* ¶ 12.) Plaintiffs allege that Defendants provided their "wealthiest and presumably their most sophisticated clients — who had assets of at least $1 million — . . . [with] higher money market yields in their bank sweep programs" so that they would "not balk" at the Tiered Cash Sweep Programs. (*Id.*)

Relying on certain Defendants' public filings, Plaintiffs allege that the Tiered Cash Sweep Programs resulted in approximately $186 billion of customers' free credit balances being deposited at the Defendant Sweep Banks and becoming available for use in Defendants' other commercial activities. (*Id.* ¶ 70.) Plaintiffs contend that "Defendants' ability to generate massive profits arose both from the ability to lend and invest client cash at eight percent or higher and from the fact that they were essentially able to create multibillion dollar banks — filled with captive brokerage client depositors — *without* any of the costs normally associated with commercial banking." (*Id.* ¶ 69 (emphasis in original).)

Plaintiffs allege that, in an "attempt to camouflage" this "egregious . . . 'client cash grab,'" Defendants implemented the Tiered Cash Sweep Programs through a deceptive scheme that was intended to defraud their customers. (*Id.* ¶ 10.) First, Plaintiffs allege that Defendants issued misleading statements in their advertisements and public websites that caused investors to believe that the Brokerage Defendants would "act not merely as 'stock brokers,' but rather as 'Financial Advisors' who [would] provide a special relationship of trust and confidence wherein the financial interests of the client come first."

(*Id.* ¶ 2.)  Second, Plaintiffs argue that, by modifying the existing Cash Sweep Program features in their customers' brokerage accounts through "negative consent," Defendants "purposely put[] the burden on the client to parse through the[ir] 'Disclosures,' and affirmatively object in order for the sweep programs *not* to go into effect . . . ." (*Id.* ¶ 14 (emphasis in original).)  Finally, Plaintiffs identify a series of alleged misrepresentations in the documents relating to their brokerage accounts, as well as the supplemental disclosures later issued by Defendants regarding the benefits of and alternatives to the Tiered Cash Sweep Programs. (*See id.* ¶¶ 13, 15-17.)

Based on these contentions, Plaintiffs argue that

> no reader of any of these purported "Disclosures" . . . could ever glean from the words used . . . that Defendants were obtaining billions of additional dollars in profit by sweeping client cash into Defendant banks as opposed to investing the cash in safe and liquid money market funds; yet were paying their clients far below money market rates for Defendants' use of client cash.

(*Id.* ¶ 14.)

### 3.  The February 2005 NYSE Information Memo

On February 15, 2005, the Member Firm Regulation Division of the New York Stock Exchange ("NYSE") issued Information Memo 05-11 to its member firms.  (SAC ¶ 75; *see also* Terry Decl. Ex. B (the "NYSE Info. Mem." or the "Memo").)[9]  In the Memo, NYSE expressed concern that changes to its members' Cash Sweep Programs "may be so significant and beyond the . . . reasonable expectations of the customer at the time of the prior [brokerage account opening] agreement that without effective subsequent disclosure the use of prior or negative consent is not sufficient."  (NYSE Info. Mem. at 2.)  The Memo described a series of "best practices" — based on NYSE Rules — that were "designed to safeguard investor interests for [cash sweep] programs currently in place."  (*Id.* at 1.)

NYSE suggested that its member firms make a series of disclosures accompanied by a "concise document, preferably on one or two pages, written in plain English and referring customers to places where additional and more detailed disclosure is available."  (*Id.* at 3.)  NYSE also recommended that its members disclose the terms, conditions, risks, and features of the Cash Sweep Programs, including "conflicts of interest, current interest rates, the manner by which future interest rates will be determined, as well as the nature and extent of . . . insurance available."  (*Id.*)

However, the Memo stated that, "[w]ith regard to existing sweep programs, it is not intended that member organizations which secured prior consent and made effective

---

[9]   NYSE's Member Firm Regulation Division no longer exists as such.  On July 26, 2007, the SEC approved the consolidation of the regulatory functions of the NYSE and the National Association of Securities Dealers ("NASD") into a single entity known as the Financial Industry Regulatory Authority ("FINRA"). *See* Press Release No. 2007-151, SEC Gives Regulatory Approval for NASD and NYSE Consolidation (July 26, 2007).

subsequent disclosure secure affirmative consent for such programs." (*Id.* at 2 n.2.) Rather, the Memo instructed that:

> Member organizations which have previously instituted or changed sweep arrangements without providing all of the appropriate disclosures discussed herein should effectively provide customers with those omitted disclosures promptly, but no later than three months after the date of this Information Memo. The utilization of the one or two page, plain English disclosure document discussed herein is required, and if so deemed by the member organization may be sufficient to satisfy these disclosure requirements.

(*Id.* at 5.)

## B. Plaintiffs' Specific Allegations Regarding Defendants' Cash Sweep Programs

In this Part, the Court briefly describes Plaintiffs' allegations against each group of Defendants in order to provide a timeline of the events at issue. Defendants' alleged misrepresentations and omissions are discussed below in connection with the Court's analysis of Plaintiffs' common-law fraud claim. *See infra* Part II.B.3.b.

### 1. The Merrill Lynch Defendants

In approximately 1977, the Merrill Lynch Defendants became the first group of Defendants to make available an Original Cash Sweep Program, which was offered in connection with Merrill Lynch's "Cash Management Account," or "CMA." (SAC ¶ 64.) In March 2000, the Merrill Lynch

Defendants began to provide their version of a Modified Cash Sweep Program, and, in June 2001, they introduced a Tiered Cash Sweep Program. (*Id.* ¶¶ 66, 67, 90.) The Merrill Lynch Defendants' Cash Sweep Program was described to customers in two undated documents cited and relied upon by Plaintiffs: the "Merrill Lynch Client Relationship Agreement," and the "Disclosures and Account Agreement" relating to, *inter alia,* the "CMA Financial Service Cash Management Account." (*See, e.g.,* SAC ¶¶ 107-09, 111-12; *see also* Pls.' Merrill Lynch Decl. Exs. 8, 9.)

Additionally, an "Information Statement" issued in 2001 regarding the Merrill Lynch Defendants' Tiered Cash Sweep Program stated that, "[e]ffective June 6, 2001, the interest rates paid to clients with deposits held at the Merrill Lynch Banks" would be determined by Merrill Lynch "based on economic and business conditions, and interest rates will be tiered based upon your relationship with Merrill Lynch as determined by the value of assets in your account(s)." (SAC ¶ 101; *see also* Pls.' Merrill Lynch Decl. Ex. 7.)

Plaintiffs Ronald Kassover and Jerome Silverman allege that, at the time the SAC was filed, they maintained "brokerage account[s]" with the Merrill Lynch Defendants. (SAC ¶¶ 31-32.) Kassover opened a CMA account with the Merrill Lynch Defendants in July 1985, and alleges that, as of December 31, 2006, he was earning 3.20% on the "uninvested cash awaiting investment" in his account. (*Id.* ¶ 31; Musoff Decl. Ex. 3.) Silverman opened a CMA account with the Merrill Lynch Defendants in August 1999, and he alleges that, as of January 31, 2007, he was earning 1.45%

interest on his free credit balances. (SAC ¶ 32; Musoff Decl. Ex. 4.)

## 2. The Morgan Stanley Defendants

The Morgan Stanley Defendants' Original Cash Sweep Program was offered as part of its "Active Assets Account," which was a brokerage account that provided "[p]ractical investment features," "essential cash management services," and "[u]nparalleled reporting" so that customers were "always in control of [their] money." (SAC ¶ 165; *see also* Pls.' Morgan Stanley Decl. Ex. 7.) The "practical investment features" associated with this account included an "[a]utomatic cash sweep," in which "[a]vailable cash balances [we]re automatically swept into bank deposit accounts . . . or a money market fund . . . ." (Pls.' Morgan Stanley Decl. Ex. 8.)

Plaintiffs allege that, in "early September 2005," the Morgan Stanley Defendants provided notice to their customers that they would be implementing a Tiered Cash Sweep Program in November 2005. (*See* SAC ¶¶ 66, 162.) According to a media report regarding the revisions, the Morgan Stanley Defendants' Tiered Cash Sweep Program swept customers' free credit balances into affiliated Sweep Banks, and paid interest to those customers based on the value of the assets they had invested. (*See id.* ¶ 162 (quoting *Investment News*).)[10]

Plaintiffs further allege that, in March 2006, Morgan Stanley issued a "Bank Deposit

Program Disclosure Statement." (*Id.* ¶ 168; *see also* Pls.' Morgan Stanley Decl. Ex. 9.) The Disclosure Statement stated that "[u]nder the Bank Deposit Program . . . , free credit balances in your Morgan Stanley brokerage account . . . will be automatically deposited into deposit accounts" at affiliated Sweep Banks. (*Id.* ¶ 169.) The Disclosure Statement further stated that "[t]he interest rates on the Deposit Accounts will be tiered based upon the value of the eligible assets in your Account . . . and deposits, if any, that you have established directly in your name with a Sweep Bank . . . ." (Pls.' Morgan Stanley Decl. Ex. 9 at 2.)

Plaintiffs Kassover and Arthur Kornblit allege that they maintained "brokerage account[s]" with the Morgan Stanley Defendants. (SAC ¶¶ 31, 35.) Kassover opened an Active Assets Account in October 1999, and alleges that, as of December 31, 2006, he was earning 3.20% on the free credit balance in his account. (*Id.* ¶ 31; Cantor Decl. Ex. B.) Kornblit opened an Active Assets Account in July 2006, and alleges that, as of March 31, 2007, he was earning 1.25% interest. (SAC ¶ 35; Cantor Decl. Ex. C.)

## 3. The Citigroup Defendants

Defendant Smith Barney, which is now an affiliate of Citigroup, offered a "Financial Management Account" ("FMA") that included a "Daily Sweep" Program that it described as follows: "In an FMA account, your excess funds are never sitting idle. Cash balances of $1 or more are automatically invested into your choice of one or more FDIC-insured, interest-bearing accounts or tax-exempt money funds." (*Id.* ¶ 190.) Smith Barney began offering a Modified Cash Sweep Program in late 1997, and, after

---

[10]   Plaintiffs do not appear to allege that the Morgan Stanley Defendants took the intermediate step of using a Modified Cash Sweep Program prior to the November 2005 implementation of their Tiered Cash Sweep Program. (*See* SAC ¶ 162.)

Citigroup merged with Salomon Smith Barney, Inc. in September 1998, the free credit balances of the Citigroup Defendants' retail brokerage clients were deposited at affiliated Sweep Banks. (*Id.* ¶ 185.)

The SAC references an undated document authored by the Citigroup Defendants and titled "Important New Account Information," which described "[a]ccount [o]pening [p]rocedures," indicated that a "Client Agreement" was enclosed, and provided information regarding "Sweep Features" associated with the account. (Pls.' Citigroup Decl. Ex. 10.) Additionally, by letter dated August 1, 2006, the Citigroup Defendants notified their customers that they would be implementing a Tiered Cash Sweep Program. (*See* SAC ¶ 192; Pls.' Citigroup Decl. Ex. 8.) The letter was accompanied by a sixteen-page brochure titled "Q&A: Important Information about changes to the [Bank Deposit Program] and to Sweep Options." (SAC ¶ 192; *see also* Pls.' Citigroup Decl. Ex. 8.)

Plaintiffs Carlo DeBlasio and Kassover allege that they maintained "brokerage account[s]" with the Citigroup Defendants. (SAC ¶¶ 30-31.) DeBlasio alleges that, as of March 31, 2007, he was earning 1.41% on his "uninvested cash awaiting investment," and Kassover alleges that, as of December 31, 2006, he was earning 3.24%. (*Id.* ¶¶ 30-31.)

4. The Charles Schwab Defendants

The Charles Schwab Defendants' Original Cash Sweep Program was known as "Schwab One Interest." (*See* SAC ¶ 131.) These Defendants implemented a Modified Cash Sweep Program on October 27, 2003, and they issued a "Disclosure Statement for

Schwab Cash Features" at some point in 2004 explaining the changes to the Program. (*Id.*; *see also* Pls.' Charles Schwab Decl. Ex. 14.) The Disclosure Statement indicated that uninvested funds would be deposited at a Charles Schwab-affiliated Sweep Bank. (SAC ¶ 145.) The Disclosure Statement also indicated that, "[g]enerally, clients with greater Household Balances will receive a higher interest rate . . . ." (*Id.*)

In "early 2005," the Charles Schwab Defendants implemented a Tiered Cash Sweep Program. (*Id.* ¶¶ 132-34.) During 2005, they notified their customers that "'[b]eginning [January 23, 2006], Schwab [would] stop putting uninvested cash in money market funds' even for its *current* customers whose 'houshold' balances were under $500,000." (*Id.* ¶ 134 (emphasis in original) (quoting the *San Francisco Chronicle*).) Finally, a document titled "Cash Features Disclosure for Individual Investors," which is dated March 2007 and referenced in the SAC, described the available cash management features for the Charles Schwab Defendants' brokerage customers. (*See* Pls.' Charles Schwab Decl. Ex. 16.)

Plaintiffs Deborah Torres and Michael R. Schirripa allege that they maintained "brokerage account[s]" with the Charles Schwab Defendants. (SAC ¶¶ 33-34.) Torres opened a "Schwab Rollover IRA" Account in November 2005, and alleges that, as of March 31, 2007, she was earning 2.55% on the free credit balance in her account. (*Id.* ¶ 33; *see also* Schachter Decl. Ex. C.) Schirripa opened a "Schwab Custodial" Account in February 1998, and a "Schwab One" Account in April 2004. (Schachter Decl. Exs. A, B.) He alleges that, as of March 31, 2007, he was earning 0.965%, and that on or about May 1,

2007 the Charles Schwab Defendants "phased out [their] Schwab One Interest feature . . . ." (SAC ¶ 34.)

### 5. The Wachovia Defendants

The Wachovia Defendants offered a "Command Asset Program," which they advertised as including a "[d]aily cash sweep with [a] competitive rate." (*Id.* ¶ 216.) During the fourth quarter of 2003, they instituted a Modified Cash Sweep Program, and on January 23, 2006, the Wachovia Defendants began to offer a Tiered Cash Sweep Program. (*Id.* ¶¶ 224, 227.) The Wachovia Defendants provided information regarding their Cash Sweep Program through an undated "Cash Sweep Program Disclosure Statement," which is referenced in the SAC. (*Id.* ¶¶ 230-31; *see also* Pls.' Wachovia Decl. Exs. 12-13.)[11]

Plaintiff Carol Washburn alleges that she maintained a "brokerage account" with the Wachovia Defendants. (SAC ¶ 36.) The account was opened in August 2002, and, as of February 28, 2006, Washburn was earning 3.29% on her "uninvested cash awaiting investment." (SAC ¶ 36; *see also* Terry Decl. Ex. C.)

### C. Procedural History

Plaintiffs commenced this putative class action by filing a complaint on January 12,

2007. (Doc. No. 1.) The case was originally assigned to the Honorable Victor M. Marrero, District Judge. (*Id.*) Plaintiffs filed an amended complaint on May 1, 2007 (Doc. No. 5), and the SAC was filed on June 11, 2007 (Doc. No. 8).

This matter was reassigned to the undersigned on October 1, 2007. (Doc. No. 30.) Defendants filed the instant motions on November 12, 2007, and briefing on the motions was completed on March 6, 2008. (Doc. Nos. 78-85.)

## II. DISCUSSION

Plaintiffs bring claims for violations of the IAA and § 349, as well as common-law claims for fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligence, breach of contract, and unjust enrichment.[12]

For the reasons set forth below, the Court concludes that: (1) with the exception of the § 349 claim, Plaintiffs have not pleaded their claims with the particularity required by Rule 9(b), and (2) all of Plaintiffs' claims are subject to dismissal pursuant to Rule 12(b)(6). Accordingly, Defendants' motions are granted, and the SAC is dismissed.

### A. Rule 9(b)

Reviewing the SAC in its entirety, the Court concludes that, with the exception of the § 349 claim, each of Plaintiffs' claims

---

[11]   Plaintiffs also allege that a "slightly different" version of the Wachovia Defendants' Disclosure Statement, which was available on a different website, contained "substantially the same language, except that it add[ed] . . . language making it clear that only individual investors with a Command Asset brokerage account [could] have a money market sweep option . . . ." (SAC ¶ 232.)

[12]   In their opposition to Defendants' motions, Plaintiffs voluntarily withdrew their "tying" claim under the Sherman Antitrust Act. (Pls.' Mem. at 4. n.6.) Accordingly, pursuant to Rule 41(a)(2), that claim is hereby dismissed.

sounds in fraud and therefore is subject to a heightened pleading standard. *See* Fed. R. Civ. P. 9(b). However, Plaintiffs' allegations lack the particularity required by Rule 9(b). Therefore, the Court dismisses Plaintiffs' claims for violations of the IAA, common-law fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment.

### 1. Applicable Law

"While the rules of pleading in federal court usually require only 'a short and plain statement' of the plaintiff's claim for relief, averments of fraud must be 'state[d] with particularity.'" *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009) (quoting Fed. R. Civ. P. 8, 9(b)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98-99 (2d Cir. 2007). The language of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns*, 493 F.3d at 99 (citing *Rombach*, 355 F.3d at 171).

In order to satisfy Rule 9(b), the plaintiff must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar*

*Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also ATSI Commc'ns*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99. Moreover, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Mills*, 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").

### 2. Analysis

This case involves "classic fraud allegations, that is, allegations of misrepresentations and omissions made with intent to defraud . . . ." *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000). The gravamen of the SAC is that

> Defendants engaged in *deceptive and misleading* "cash sweep" programs . . . whereby Defendants, acting in the role and guise of Plaintiffs' "Financial Advisors" caused billions of their clients' uninvested cash to be automatically swept . . . into Defendants' owned and controlled bank accounts, so that [D]efendants were able to use their clients' uninvested cash for *their own profit* . . . .

(SAC ¶ 1 (first emphasis added).) Specifically, Plaintiffs allege that

> [s]o egregious was Defendants' "client cash grab" that Defendants

*well understood* that they needed to take a number of *well calculated steps* — including a mixture of *blatant misrepresentations* and obtuse and misleading disclosures — in order to attempt to camouflage or conceal the deceit and fraud from their own clients and the public.

(*Id.* ¶ 10 (emphasis added).) Elaborating on this theory, Plaintiffs further allege that "D e f e n d a n t s, by their *affirmative misrepresentations*, held themselves out as fiduciaries with their loyalties and trust to . . . enhance their clients' assets and accounts, including their cash holdings." (*Id.* ¶ 6 (emphasis added).)

As these quotations from the SAC make clear, this action is based on averments of fraud. In light of this general theory of the case, there is little question that four of Plaintiffs' claims are subject to the requirements of Rule 9(b): common-law fraud; violations of the IAA (*see* Pls.' Mem. at 36 (referring to Defendants' alleged "scheme to defraud clients" under the IAA)); breach of fiduciary duty (*see* SAC ¶¶ 278, 285 (alleging that "Defendants participated in a false and deceptive scheme" and that their "conduct was willful, wanton, and reckless")); and aiding and abetting a breach of fiduciary duty (*see id.* ¶ 288 (alleging that the Parent and Sweep Bank Defendants "knowingly induced . . . fiduciary breaches" by, *inter alia,* "approving or ratifying both the bank sweep programs . . . and the disclosures" regarding the Programs)). *See, e.g., Frota v. Prudential-Bache Sec.,* 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty — statutory, common law, tort, contractual, or fiduciary.").

Plaintiffs offer no argument to the contrary with respect to these claims, which therefore must be pleaded with particularity pursuant to Rule 9(b).

Superficially, Plaintiffs' claims for negligent misrepresentation, negligence, breach of contract, and unjust enrichment present closer questions. However, the Second Circuit has noted with approval the Ninth Circuit's rejection of a plaintiff's "effort to characterize claims by the label used in the pleading" because "'[t]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims . . . .'" *Rombach,* 355 F.3d at 172 (quoting *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1405 n.2 (9th Cir. 1996)). Just so here. To the extent any of Plaintiffs' claims are "premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of [Rule 9(b)]." *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 311 (Bankr. S.D.N.Y. 1999); *see also Daly v. Castro Llanes,* 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (citing *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991)). Consequently, "[t]he ultimate question is whether, at its core, the [SAC] is predicated on allegations of fraudulent conduct." *Ladmen Partners, Inc. v. Globalstar, Inc.,* No. 07 Civ. 976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008); *see also Rombach,* 355 F.3d at 171 ("[Rule 9(b)] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."); *Matsumura v. Benihana Nat. Corp.,* 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008) (holding that Rule 9(b) applied to all claims in a pleading that contained a "quintessential

averment of fraud" and that, "to the extent the plaintiffs have alleged a non-fraud predicate for any of their claims, they have made no effort to meaningfully distinguish the fraud allegations in the amended complaint . . ."); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 285 (S.D.N.Y. 2001) ("[A]lthough plaintiffs have characterized their claims as being for negligence, in substance they charge fraud.").

Plaintiffs have made, at most, a half-hearted effort to articulate a non-fraudulent basis for their claims for negligent misrepresentation, negligence, breach of contract, and unjust enrichment. Each of Plaintiffs' claims incorporates by reference all of the allegations in the SAC and is predicated on their allegations of affirmative representations by Defendants regarding the nature of the Cash Sweep Programs. (SAC ¶¶ 247, 255, 261, 270, 277, 286, 292, 298, 303.) "[W]here the complaint incorporates by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must then be pleaded according to [Rule 9(b)]." *Stratton Oakmont*, 234 B.R. at 311; *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 246 n.53 (S.D.N.Y. 1997); *cf. In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005) ("Plaintiffs cannot so facilely put the fraud genie back in the bottle."). Therefore, the Court looks to the gravamen of Plaintiffs' allegations, rather than the labels of their claims, to determine the applicability of Rule 9(b).

With respect to Plaintiffs' claim for negligent misrepresentation, the Second Circuit has expressly left open the question of whether such a claim is subject to Rule 9(b)'s pleading requirements. *See Eternity Global* *Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004). However, "[d]istrict court decisions in this Circuit have held that the Rule is applicable to such claims . . . ." *Id.* (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, No. 02 Civ. 1312 (LMM), 2003 WL 21305355, at *4 (S.D.N.Y. June 5, 2003) (collecting cases)). Therefore, contrary to Plaintiffs' argument (Pls.' Mem. at 54), their negligent misrepresentation claim is not, as a matter of law, immune from Rule 9(b)'s particularity requirements. Moreover, this claim, as pleaded, is based on the "false and misleading" nature of Defendants' alleged "misrepresentations, concealment and omissions of material facts . . . ." (SAC ¶ 304.) In light of Plaintiffs' theory of this case and their contentions regarding the manner in which Defendants allegedly made misstatements and omissions, the Court concludes that the negligent misrepresentation claim must be pleaded with particularity.

This reasoning also applies to Plaintiffs' claims for negligence, breach of contract, and unjust enrichment. In their negligence claim, Plaintiffs allege that the Brokerage Defendants owed them a general duty of care as to the "deployment of 'sweep' monies," that the Brokerage Defendants violated these duties by, *inter alia*, "making the misrepresentations and omissions set forth" in the SAC, and that this conduct "was, *at minimum*, negligent." (*Id.* ¶¶ 293-95 (emphasis added).) Neither labeling the claim as one of negligence nor offering this "at minimum" caveat is sufficient to avoid the application of Rule 9(b).

In their breach of contract claim, Plaintiffs allege that, "by making the misrepresentations and omissions set forth" in the SAC, the

Brokerage Defendants breached the implied covenant of good faith and fair dealing. (*See id.* ¶ 273; *see also* Pls.' Mem. at 57-58.) Finally, Plaintiff's unjust enrichment claim is based on the same predicate allegations relating to a fraudulent scheme, which purportedly "yielded enormous ill-gotten profits." (SAC ¶ 301.) Therefore, because these claims are based on the same allegations of intentional misrepresentations and omissions by Defendants that are described throughout the SAC, they are subject to Rule 9(b).[13]

The SAC alleges that Defendants' conduct exceeded mere negligence, and rose to the level of "calculated" and intentional misdeeds. (*Id.* ¶ 10.) Rule 9(b) requires that where, as here, these types of allegations are levied, the defendants named in the plaintiff's claims be afforded notice of the bases for the plaintiff's contentions. Accordingly, with the exception of Plaintiffs' claim under § 349, Plaintiffs' claims must be pleaded with particularity under Rule 9(b).

Turning to the application of Rule 9(b), the structure of the SAC is crucial to the analysis. In the SAC, Plaintiffs define five short forms that include pairings of Parent Defendants and Brokerage Defendants: "Merrill Lynch" (SAC ¶¶ 38-39); "Morgan Stanley" (*id.* ¶¶ 41-42); "Smith Barney" (*id.* ¶¶ 44-45 (collectively referring to Defendants Citigroup, Inc. and Citigroup Global Capital Markets Inc.)); "Schwab" (*id.* ¶¶ 47-48); and

"Wachovia" (*id.* ¶¶ 50-51). Plaintiffs' definitions of these short forms do not include the Sweep Bank Defendants. Instead, Plaintiffs identify in separate paragraphs the Sweep Bank Defendants that are affiliated with each of the five pairings of Parent and Brokerage Defendants. (*See id.* ¶¶ 40, 43, 46, 49, 52.) However, when presenting allegations regarding misstatements and other conduct by Defendants (*see* Pls.' Mem. at 39-40), Plaintiffs attribute all such acts to the respective pairings of Parent and Brokerage Defendants. (*See, e.g., id.* ¶¶ 81, 120, 154, 176, 208.)

The SAC's presentation of allegations in this fashion is insufficient as a matter of law with respect to the claims to which Rule 9(b) is applicable. First, Plaintiffs have not adequately pleaded fraudulent misstatements or omissions by the Sweep Bank Defendants. Based on Plaintiffs' allegations, the Sweep Bank Defendants were little more than passive recipients of the free credit balances that were swept out of accounts maintained by the Brokerage Defendants. Indeed, not a single allegation in the 330-paragraph SAC directly identifies a statement or act by the Sweep Bank Defendants, and the vast majority of the references in the pleading to these Defendants appear in quotations that Plaintiffs attribute to other Defendants. (*See, e.g.,* SAC ¶¶ 99, 202.) Plaintiffs offer no explanation for this deficiency. Accordingly, with the exception of the § 349 claim, Plaintiffs' claims against the Sweep Bank Defendants are dismissed pursuant to Rule 9(b).

Second, to the extent the SAC does contain allegations regarding fraudulent misstatements, omissions, and other misconduct by Defendants, Plaintiffs attribute

---

[13]    As Plaintiffs point out, the Second Circuit has held that, as a categorical matter, claims under § 349 are only required to meet the requirements of Rule 8(a). *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008) (citing *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)).

such events to Parent-Brokerage Defendant pairings rather than to specific parties. Such allegations do not satisfy Rule 9(b). Plaintiffs "'may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be [apprised] of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'" *Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988 (GEL), 2007 WL 1732427, at *7 (S.D.N.Y. June 14, 2007) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995)); *see also Mills*, 12 F.3d at 1175; *DiVittorio*, 822 F.2d at 1247; *Filler v. Hanvit Bank*, Nos. 01 Civ. 9510, 02 Civ. 8251 (MGC), 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) (finding that the plaintiffs had failed to meet the requirements of Rule 9(b) because they failed to "make allegations with respect to each defendant, but instead refer[red] only generally to the defendants as 'the Banks' or 'the Korean Banks'"); *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 640-41 (S.D.N.Y. 1999); *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 Civ. 3231 (RPP), 1998 WL 167330, at *11 (S.D.N.Y. Apr. 8, 1998); *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 126 (S.D.N.Y. 1997); *Pallickal v. Tech. Int'l Ltd.*, No. 94 Civ. 5738 (DC), 1996 WL 153699, at *1 (S.D.N.Y. Apr. 3, 1996); *Manela v. Gottlieb*, 784 F. Supp. 84, 87 (S.D.N.Y. 1992).

Lastly, Plaintiffs make almost no effort to identify the place and time that these alleged misrepresentations were made to them, and Plaintiffs' allegations regarding why the statements were materially misleading are deficient. *See, e.g.*, *Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau*, No. 08 Civ. 6572 (JGK), 2008 WL 4702458, at *4

(S.D.N.Y. Oct. 3, 2008) ("The plaintiff's complaint fails [the Rule 9(b)] standard because the allegations in the complaint do not specify the time, place, [or] speaker . . . of the misrepresentations that were allegedly made through the mails and over the Internet."). Specifically, the Court finds unavailing Plaintiffs' assertions that Defendants' statements were "materially false and misleading" because: (1) Defendants' retail brokerage customers were offered "no alternative vehicles for uninvested cash" (*see, e.g.*, SAC ¶ 104); (2) "no *bona fide* disinterested 'Financial Advisor' would ever recommend" enrolling in the Cash Sweep Programs (*see, e.g.*, *id.* ¶ 118); and (3) Defendants failed to disclose the amount of their profits from these Programs (*see, e.g.*, *id.* ¶ 115). Plaintiffs have not pleaded facts suggesting that Defendants were under an obligation to provide them with investment advice, *see infra* Part II.B.2.b (discussing Plaintiffs' IAA claim), and Defendants did not engage in a material omission by failing to disclose the precise amount of the profits they earned in connection with their respective Cash Sweep Programs, *see infra* Part II.B.3.c.(2) (concluding that this alleged omission was immaterial as a matter of law). Moreover, it is entirely unclear how these alleged omissions rendered fraudulent Defendants' disclosures regarding the mechanics of their respective Cash Sweep Programs, such as interest rates, the availability of FDIC insurance, and the manner in which Defendants earned money by providing these services. *See ATSI Commc'ns*, 493 F.3d at 99 (noting that "[a]llegations that are conclusory or unsupported by factual assertions are insufficient" to satisfy Rule 9(b)); *cf. Powe v. Cambium Learning Co.*, No. 08 Civ. 1963 (JGK), 2009 WL 2001440, at *7 (S.D.N.Y.

16

June 9, 2009). Therefore, as to the Parent and Brokerage Defendants, Plaintiffs have failed to meet the requirements of Rule 9(b).

In sum, both the SAC and Plaintiffs' arguments in opposition to Defendants' motions make clear that their claims sound in fraud. As such, Plaintiffs must plead with particularity their claims for violations of the IAA, common-law fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation, negligence, breach of contract, and unjust enrichment. For the reasons stated above, Plaintiffs have not done so. Accordingly, these claims are dismissed pursuant to Rule 9(b).

### B. Rule 12(b)(6)

In addition to the SAC's lack of particularized allegations against each Defendant, Plaintiffs' allegations are also subject to three general deficiencies. First, Plaintiffs have failed to offer allegations capable of supporting a plausible inference that they had anything more than a nondiscretionary broker-client relationship with any Defendant. Second, although the Brokerage Defendants owed Plaintiffs a transaction-specific duty of care, Plaintiffs have not alleged that this duty was breached through Defendants' implementation of the Cash Sweep Programs. Third, Plaintiffs have not identified any materially misleading statements, or omissions by Defendants in contravention of an existing disclosure obligation. Therefore, as discussed in more detail below, these broad defects in the SAC prevent Plaintiffs from adequately pleading claims for the relief they seek. Accordingly, Defendants' motions to dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(6) are granted.

### 1. Legal Standard

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in Plaintiffs' favor. *ATSI Commc'ns*, 493 F.3d at 98; *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and emphasis omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal citation omitted). Applying this standard, if Plaintiffs "have not nudged their claims across the line from

17

conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## 2.   Investment Advisers Act

In their first cause of action, Plaintiffs assert that the Brokerage Defendants' alleged misrepresentations and omissions regarding the Modified and Tiered Cash Sweep Programs breached "fiduciary dut[ies]" owed to their customers under the IAA. (*See* SAC ¶¶ 247-251.) Plaintiffs assert that they are entitled to have their "bank sweep account agreements" voided pursuant to 15 U.S.C. § 80b-15(b), and they seek an accounting, restitution, and disgorgement of "all monies and fees wrongfully obtained by Defendants and their affiliates pursuant to the bank sweep account program . . . ." (SAC ¶¶ 252, 254.)

For the reasons set forth below, the Court concludes that Plaintiffs' allegations do not support the existence of an investment advisory relationship under the IAA as to any Defendant, and that the relief Plaintiffs seek is unavailable in a private lawsuit under the statute. Therefore, Plaintiffs have failed to state a claim for alleged violations of the IAA, and this cause of action is dismissed pursuant to Rule 12(b)(6).

### a.   Applicable Law

"[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but . . . the Act confers no other private causes of action, legal or equitable." *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 24 (1979). Section 206 of the IAA states that:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b-6(2). This provision is given "teeth" by section 215 of the Act, which "provides that any investment adviser contracts whose formation or performance would violate the provisions of the IAA 'shall be void.'" *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 388 (S.D.N.Y. 2004) (quoting 15 U.S.C. § 80b-15).

In order to maintain a private action under section 215 of the IAA, a plaintiff must allege that he or she entered into a contract for investment advisory services with an investment adviser. *See Kassover v. UBS AG*, No. 08 Civ. 2753 (LMM), 2008 WL 5331812, at *3 (S.D.N.Y. Dec. 19, 2008); *Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702 (RWS), 2005 WL 488641, at *13 (S.D.N.Y. Mar. 2, 2005) ("Only parties to an investment advisory contract may sue for rescission under section 215."). Moreover, the only relief available to a private litigant under the IAA is rescission and "restitution of the consideration given under the contract." *Transamerica Mortgage Advisers*, 444 U.S. at 25 n.14. Therefore, a plaintiff may not seek "compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction." *Id.*; *see also Kassover*, 2008 WL 5331812, at *5.

### b. Analysis

Plaintiffs' IAA claim is deficient in at least two respects: (1) Plaintiffs do not allege that they received investment advisory services from Defendants, and they have not identified investment advisory contracts to which they were parties; and (2) in the absence of a voidable investment advisory contract, the relief sought by Plaintiffs is unavailable in a private right of action under the IAA.

Both the named Plaintiffs and the members of the putative class held nondiscretionary *brokerage* accounts with Defendants. (*See* SAC ¶¶ 30-36, 54.) That reality notwithstanding, Plaintiffs attempt to plead the existence of an investment advisory relationship with Defendants through the allegation that they entered into "express, implied or assumed cash sweep contracts" with the Brokerage Defendants. (*Id.* ¶ 248.) However, "[p]laintiffs must establish by more than conclusory allegations that the defendant was an investment adviser." *Hall v. Paine, Webber, Jackson & Curtis, Inc.*, No. 82 Civ. 2840 (DNE), 1984 WL 812, at *2 (S.D.N.Y. Aug. 27, 1984). The opening of brokerage accounts does not automatically give rise to an investment advisory relationship under the IAA. *See Kassover*, 2008 WL 5331812, at *4 (dismissing IAA claim where "the contracts [p]laintiffs entered into and the only ones referred to in the Amended Complaint (and therefore properly considered in a motion to dismiss) are 'brokerage' agreements"). Thus, although there may have been agreements between Plaintiffs and the Brokerage Defendants regarding the Cash Sweep Programs, it does not necessarily follow that the agreements in question provided for

investment advisory services covered by the IAA.

Indeed, the language of the documents provided to Plaintiffs in connection with their accounts indicates that no Defendant undertook to provide investment advisory services:

- The Merrill Lynch Defendants' "Disclosures and Account Agreement" regarding its CMA account disclaimed the existence of any right to unsolicited investment advisory services in relation to customers' free credit balances: "[N]either your Financial Advisor nor Merrill Lynch undertakes any obligation to ensure you receive any particular rate of interest or to advise you to invest your cash or bank deposit balances in higher yielding cash alternatives." (SAC ¶ 111.)

- The Morgan Stanley Defendants issued a March 2006 "Active Assets Account Client Agreement," which stated that "[t]his Account is a brokerage account and is not regulated by the Investment Advisors [sic] Act of 1940. The services and tools we offer in connection with this Account are brokerage tools." (Cantor Decl. Ex. D at 3.)

- The Citigroup Defendants' "Important New Account Information" document, which is relied on by Plaintiffs in the SAC (*see, e.g.*, SAC ¶ 202), stated that

the "Smith Barney AssetOne account is a brokerage account and not an advisory account. Smith Barney's interests may not be the same as yours." (Pls.' Citigroup Decl. Ex. 10 at 71.) The document also warned customers that, "[i]f you decide to open an investment advisory account, we will provide you with more information regarding these services . . . ." (*Id.* at 3.)

- The Charles Schwab Defendants' "Schwab One Brokerage Account Application" listed its Tiered Cash Sweep Program as a "Brokerage Feature[]," and specifically stated that: "You agree that you . . . are solely responsible for investment decisions in your Account. . . . Unless Schwab otherwise agrees with you in writing, Schwab does not have any discretionary authority or obligation to review or make recommendations for the investment of securities or cash in your Account." (Pls.' Charles Schwab Decl. Ex. 17 at 3, 7.)

- The Wachovia Defendants' "MarketLink Investor's Account Opening Form," which was completed by Plaintiff Carol Washburn — the only named Plaintiff who alleges that she maintained an account at Wachovia — stated that "[a]ll transactions will be done only on my order or the order of my authorized delegate . . . ." (Terry Decl. Ex. D at 3.)

In their opposition to Defendants' motions, Plaintiffs argue that their Cash Sweep Program "'contracts' consisted of disclosures approved — purportedly — by way of negative consent." (Pl.'s Mem. at 8 n.7.) However, rather than providing investment advice regarding topics that would bring Defendants within the IAA's definition of "investment adviser" — such as, "the value of securities" or the "advisability of investing in . . . securities," 15 U.S.C. § 80b-2(11) — the disclosure documents relating to Defendants' Modified and Tiered Cash Sweep Programs amended the terms of the features described in Plaintiffs' account agreements. These disclosure documents did not provide investment advice that brought the agreements within the purview of the IAA. *See Kassover*, 2008 WL 5331812, at *4 (finding that the plaintiffs' allegation that the defendant "recommended [that the] [p]laintiffs invest in [auction rate securities] is insufficient to infer an investment advisory agreement in the context of a non-discretionary brokerage account"). In fact, Defendants warned Plaintiffs that they should do their own research and seek additional advice if necessary:

- Merrill Lynch Defendants: "You should review your account statement and speak to your Financial Advisor . . . to determine current [interest] rates. You should also compare the interest rates, account charges and other features with other accounts, cash sweep programs, and alternative investments offered by Merrill Lynch or other institutions." (Pls.' Merrill Lynch Decl. Ex. 7 at 1.)

- Morgan Stanley Defendants: "You should compare the terms, interest rates, required minimum amounts, and other features of the Deposit Accounts with other deposit accounts and alternative cash investments. You may obtain information with respect to the current interest rates and interest rate tiers by contacting your Financial Advisor or accessing Morgan Stanley's public Web site . . . ." (Pls.' Morgan Stanley Decl. Ex. 9 at 3.)

- Citigroup Defendants: "You may obtain information about your Deposit Accounts, including balances, the current interest rate and the names and priority of the other Affiliated Program Banks at which Deposit Accounts are currently available by contacting your Financial Advisor." (Pls.' Citigroup Decl. Ex. 8 at 12.)

- Charles Schwab Defendants: "You should compare the terms, interest rates, required minimum amounts, and other features of the Bank Deposit Feature with other accounts and alternative investments." (Pls.' Charles Schwab Decl. Ex. 14 at 9.)

- Wachovia Defendants: "You must monitor and determine the best sweep option for you under this program. . . . Wachovia Securities does not have any duty to monitor the Cash Sweep Option for your account or make recommendations about, or

changes to, the Sweep Program that might be beneficial to you." (SAC ¶ 237.)

Apart from the allegations relating to these disclosure documents, no Plaintiff alleges that any specific interaction with a Brokerage Defendant took place that rose to the level of advice regarding investment in securities.

In light of Plaintiffs' failure to identify an investment advisory contract or other investment advisory services that they received from Defendants, it is of no moment that, generally speaking, the Brokerage Defendants registered some of their "Financial Advisors" as "Investment Advisers" under the IAA. *See Norman*, 350 F. Supp. 2d at 388 (noting that the IAA provides "no remedy for plaintiffs who are not investor-clients" or for "conduct that is not pursuant to an investor-adviser contract"); *Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.*, 459 F. Supp. 597, 608 (S.D.N.Y. 1978) ("It is clear that an advisor/client relationship is essential to any action brought under Section 206."). Therefore, Plaintiffs cannot maintain a private cause of action under the IAA to void the agreements relating to the Cash Sweep Program features in their brokerage accounts because these contracts were not "investment advisory contracts" for purposes of the IAA.

In addition to the lack of allegations supporting an inference that an investment advisory relationship existed between Plaintiffs and Defendants, the relief Plaintiffs seek is unavailable in a private cause of action under the IAA. "The only remedy available under the Advisers Act is rescission of the investment advisory contract and restitution of consideration paid for investment advisory

services." *Kassover*, 2008 WL 5331812, at *5. In their IAA claim, Plaintiffs seek: (1) "a declaratory judgment that the sweep account agreements with the Class are void"; (2) "an accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants and their affiliates pursuant to the bank sweep account program[s]"; and (3) "disgorgement of all profits made by the Brokerage Defendants . . . ." (SAC ¶ 254.) Yet, because Plaintiffs have not identified an investment advisory contract in their allegations, there is no agreement to declare void or to rescind under the IAA. Moreover, as Plaintiffs have not alleged that they received investment advisory services, it is not surprising that the SAC lacks allegations regarding consideration paid *by Plaintiffs* for such services. Indeed, the only fees alleged to have been paid by Plaintiffs are the general fees associated with their brokerage accounts. (*See, e.g.*, *id.* ¶ 249.) Such fees are not recoverable in a private cause of action under the IAA. *See Transamerica Mortgage Advisers*, 444 U.S. at 24 n.14. Similarly, Plaintiffs cannot use a private cause of action under the IAA to obtain a share of Defendants' *profits* from the Cash Sweep Programs. Even if Plaintiffs had alleged that they received investment advisory services, Defendants' profits did not constitute "consideration paid" by Plaintiffs for those services. *Kassover*, 2008 WL 5331812, at *5.

Thus, Plaintiffs' allegations do not support a plausible inference that they were parties to investment advisory contracts, and the relief that they seek is unavailable under the IAA. Accordingly, Plaintiffs' claim for violations of the IAA is dismissed pursuant to Rule 12(b)(6).

### 3. Common-law Fraud[14]

Plaintiffs allege that Defendants committed common-law fraud by making a series of misrepresentations and omissions that "were false and misleading" because "customers' cash balances were being reinvested for [Defendants'] profits at the customers' expense." (SAC ¶ 263.) Specifically, Plaintiffs have identified five categories of alleged misrepresentations: two categories relate to Defendants' advertisements and public statements regarding the type of relationship Defendants aspired to develop with their clients, and the remaining three categories relate to the details of the Modified and Tiered Cash Sweep Programs. In addition to the alleged misrepresentations, Plaintiffs also contend that Defendants' failure to disclose the profits

---

[14] With the exception of the Wachovia Defendants, which argue that Virginia law applies, the parties agree that New York law governs Plaintiffs' state-law claims. (*See* Pls.' Mem. at 110.) Where "[t]he parties' briefs assume that New York law controls, . . . such 'implied consent . . . is sufficient to establish choice of law.'" *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345 (RJS), 2009 WL 755292, at *6 n.6 (S.D.N.Y. Mar. 20, 2009) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

With respect to the Wachovia Defendants' arguments, the Court need not "embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions." *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). In this regard, the Wachovia Defendants have identified only two material differences between the relevant law of New York and Virginia — the availability of claims for violations of § 349 and negligent misrepresentation. However, in light of the Court's conclusion that Plaintiffs have failed to state a claim under New York law with respect to these causes of action, the Court does not reach the Wachovia Defendants' choice of law arguments.

they earned from the Cash Sweep Programs was a material omission.

For the reasons stated below, the Court concludes that Plaintiffs have not adequately pleaded a plausible claim for common-law fraud based on the alleged misstatements and omissions identified in the SAC. First, Defendants' advertisements and other public statements regarding the nature and quality of their services constituted puffery. Second, reviewing as a whole the disclosure documents identified in the SAC, Plaintiffs have failed to identify any materially misleading statements by Defendants regarding the mechanics of the Cash Sweep Programs. Finally, with respect to Defendants' alleged failure to quantify their profits from the Cash Sweep Programs, the Court finds this omission to be immaterial as a matter of law. Accordingly, Plaintiffs' common-law fraud claim is dismissed.

a. Applicable Law

The elements of a fraud claim under New York law are: "1) a material false representation made by defendant; 2) defendant intended to defraud plaintiff thereby; 3) plaintiff's reasonable reliance; and 4) plaintiff's damages as a result of the reliance." *Randolph Equities, LLC v. Carbon Capital, Inc.*, No. 05 Civ. 10889 (PAC), 2007 WL 914234, at *6 (S.D.N.Y. Mar. 26, 2007) (citing *Keywell Corp. v. Weinstein*, 33 F.3d 159, 163-64 (2d Cir. 1994)).

With respect to the requirement that the alleged misrepresentations and omissions be material, the Second Circuit has held that "certain information is 'so basic that any investor could be expected to know it.'" *Levitin v. Painewebber, Inc.*, 159 F.3d 698,

702 (2d Cir. 1998) (quoting *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984)). Specifically,

> the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money. Some bank accounts are not interest-bearing — *e.g.*, most checking accounts — even though the balances in such accounts are used by banks to earn money. Even interest-bearing bank accounts — and money market accounts with brokers for that matter — do not return to the investor the amount earned but rather pay a contractual rate. *None of these routine practices is regarded as deceptive or even unusual.*

*Id.* at 703 (emphasis added).

b. Alleged Misrepresentations

In their opposition to Defendants' motions, Plaintiffs identify five categories of statements that they contend were misleading: (1) promises of a "Special Relationship with Clients"; (2) statements regarding customers' rights as investors and Defendants' codes of ethics (the "Investor Rights Statements"); (3) statements about the financial benefits that Defendants received from the Modified and Tiered Cash Sweep Programs; (4) statements regarding potential benefits to customers from these Programs; and (5) statements describing customers' alternatives to depositing free credit balances at affiliated Sweep Banks in the Cash Sweep Programs. (Pls.' Mem. at 39-40.) Although there is some overlap between these categories, below the Court provides

23

examples of each type of alleged misrepresentation identified by Plaintiffs.

(1) Defendants' "Special Relationship with Clients"

Plaintiffs first allege that Defendants made a series of misrepresentations, which appeared for the most part on Defendants' websites and in their advertisements (*see, e.g.*, SAC ¶ 85), regarding the nature of the relationships that they sought to establish with clients and customers:

- "Merrill Lynch presented to its clients on its website a 'Client Commitment' statement which provide[d] in no uncertain terms that the client is Merrill Lynch's first priority . . . ." (*Id.* ¶ 81.)

- The Morgan Stanley Defendants' "'Global Wealth Management'" website stated that "'[o]btaining your financial goals is number one . . . on your Financial Advisor's list.'" (*Id.* ¶¶ 154-55 (quoting website).)

- The Citigroup Defendants maintained a "web page called 'Working with Your Financial Advisor,'" which "emphasize[d] the importance in confiding and relying on the personal relationship with the Smith Barney Financial Advisor . . . ." (*Id.* ¶ 176.)

- The Charles Schwab Defendants' website contained an "open Letter to Investors" from "its namesake and founder, Charles Schwab,"

which stated that "'[f]rom day one, I've made it our business to put the needs of the individual investors first.'" (*Id.* ¶ 120 (quoting website).)

- The Wachovia Defendants' website stated that "'[a]t Wachovia Securities, our Financial Advisors are committed to your financial welfare.'" (*Id.* ¶ 212 (quoting website).)

Plaintiffs allege that these statements were misleading because, rather than seeking to maximize their customers' earnings on free credit balances, Defendants were allegedly using their customers' uninvested funds to increase their own profits. (*See, e.g.*, *id.* ¶¶ 86, 89, 144.) According to Plaintiffs, "the cash sweep program[s] ensured . . . clients were put '*second*' after [Defendants'] profit . . . ." (*Id.* ¶ 86 (emphasis in original).)

(2) Defendants' Investor Rights Statements

Plaintiffs further allege that each group of Defendants issued a series of Investor Rights Statements regarding their commitments to customers. For example:

- The Merrill Lynch Defendants' "Commitment to Clarity" brochure stated that "[w]e believe that the needs of the investor should always come first." (*Id.* ¶ 88.)

- The Morgan Stanley Defendants' "Code of Ethics" stated that "the firm's clients, shareholders, competitors and the public have come to expect more from us than

simple obedience to the letter of the law. They expect the highest degree of ethics, honesty and fairness in all our dealings." (*Id.* ¶ 160.)

- The Citigroup Defendants' Investor Rights Statement, which was titled "Our Mutual Commitment," stated that customers have a right "[t]o be treated in a fair, ethical and respectful manner in all interactions . . . ." (*Id.* ¶ 183.)

- The Charles Schwab Defendants' "Code of Business Conduct and Ethics" document "state[d] that [Charles Schwab's] 'Vision' is to 'Provide clients with the most useful and ethical financial services in the world . . . .'" (*Id.* ¶ 129.)

- The Wachovia Defendants' website "include[d] a 'Client Commitment' web page which assure[d] clients that . . . '[y]ou will be informed of any significant conflict of interest, and we will always act in your best interest.'" (*Id.* ¶ 217 (quoting website).)

Similar to the first category, Plaintiffs allege that this category of misstatements was "deceptively false and misleading" because, although these statements suggested that Defendants would seek to maximize their customers' earnings on free credit balances, Defendants used the Cash Sweep Programs to maximize their own profits and paid customers lower amounts of interest. (*See, e.g., id.* ¶¶ 184, 219.)

### (3)  Defendants' Benefits from the Cash Sweep Programs

In the third category of alleged misrepresentations, Plaintiffs allege that Defendants misstated the extent of the financial benefits that they derived from the Cash Sweep Programs. The alleged misstatements in this category are nearly identical as to each of the five groups of Defendants. (*See* SAC ¶ 114 (Merrill Lynch); *id.* ¶ 147 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).)

For example, Plaintiffs note that the Merrill Lynch Defendants disclosed to their customers that the modifications to the Cash Sweep Programs would "be financially beneficial" to them in an amount determined by the "difference between the interest paid and other costs incurred . . . on bank deposits, and the interest or other income earned on [the Merrill Lynch Defendants'] loans, investments and other assets." (*Id.* ¶ 114.) Plaintiffs allege that such statements were false and misleading because Defendants "failed to disclose the *amount* by which Merrill Lynch and its affiliates profited from bank account sweeps and that the sweep system was rigged to pay clients less interest than money market funds for the sole purpose of increasing Merrill Lynch profits at its clients['] expense." (*Id.* ¶ 115 (emphasis in original); *see also id.* ¶ 148 (Charles Schwab); *id.* ¶ 174 (Morgan Stanley); *id.* ¶ 198 (Citigroup); *id.* ¶ 243 (Wachovia).)

### (4)  Customers' Benefits from the Cash Sweep Programs

Plaintiffs allege that, in order to entice customers to permit their free credit balances

to be used in the Modified and Tiered Cash Sweep Programs, Defendants also made a series of misrepresentations regarding the benefits and advantages to customers of the Cash Sweep Programs. Like the alleged misstatements regarding the benefits Defendants derived from the Cash Sweep Programs, Plaintiffs' allegations regarding this category of misstatements are nearly identical as to each group of Defendants.

Examples of these alleged misstatements include promises that the Cash Sweep Programs would make customers' money "work harder" (*id.* ¶¶ 189-90), allow customers to "keep [their] money working" (*id.* ¶¶ 99, 165-66), and permit customers to "make the most of [their] cash" (*id.* ¶ 139). (*See id.* ¶ 97 (Merrill Lynch); *id.* ¶ 126 (Charles Schwab); *id.* ¶ 166 (Morgan Stanley); *id.* ¶ 189 (Citigroup).) Plaintiffs further allege that Defendants emphasized that participation in their respective Cash Sweep Programs was free, that deposits at affiliated Sweep Banks were insured by the FDIC, and that purchasing shares of money market mutual funds involved more risk because those investments were not FDIC-insured. (*See, e.g., id.* ¶¶ 15, 99, 126, 145, 191, 245.)

Plaintiffs allege that these statements were misleading because Defendants failed to disclose that customers' money would be "working *harder*" in money market mutual funds, as opposed to deposit accounts at affiliated Sweep Banks. (*See id.* ¶ 189 (emphasis added).) For example, Plaintiffs assert that the Merrill Lynch Defendants "did not maximize Plaintiffs' 'short term finances' or 'keep money working' effectively but rather ensured client cash was sweep [sic] into bank accounts where defendants could use the

cash to truly 'maximize' Merrill Lynch's own profit." (*Id.* ¶ 98.) Similarly, Plaintiffs allege that the Morgan Stanley Defendants' statements in this category were misleading because

> they failed to disclose that there was no reason to pay clients the bank rate [at affiliated Sweep Banks] other than to additionally enhance Morgan Stanley profits from the use of its clients' uninvested cash and that no *bona fide* disinterested 'Financial Advisor' would ever recommend . . . a scheme which would place uninvested cash in bank account[s] bearing interest of less than 1% over money market funds and that in all events such a scheme did not 'keep cash working' for Plaintiffs.

(*Id.* ¶ 167; *see also id.* ¶¶ 128, 144 (Charles Schwab); *id.* ¶ 196 (Citigroup); *id.* ¶ 246 (Wachovia).)

### (5) Customer Alternatives to Depositing Their Free Credit Balances at Affiliated Sweep Banks

Lastly, Plaintiffs allege that Defendants made misrepresentations regarding customers' alternatives to having their free credit balances deposited at affiliated Sweep Banks. Here, Plaintiffs identify a series of substantially similar statements made by each group of Defendants that directed customers to compare interest rates, evaluate other banks' Cash Sweep Programs, and speak with their "Financial Advisors" regarding alternatives for their free credit balances. (*See id.* ¶¶ 103, 109, 111-12 (Merrill Lynch); *id.* ¶ 152 (Charles Schwab); *id.* ¶ 171 (Morgan

26

Stanley); *id.* ¶ 195 (Citigroup); *id.* ¶ 231 (Wachovia).)

For the most part, the SAC alleges that Defendants indicated to customers that money market mutual funds were the primary investment alternative to the Modified and Tiered Cash Sweep Programs. (*Id.* ¶ 99 (Merrill Lynch); *id.* ¶¶ 150-52 (Charles Schwab); *id.* ¶ 195 (Citigroup); *id.* ¶ 231 (Wachovia).) However, Plaintiffs contend that Defendants offered a misleading comparison between making deposits at Sweep Banks and owning shares of mutual funds. (*See, e.g., id.* ¶ 62.) Specifically, Plaintiffs allege that Defendants overemphasized the utility of the FDIC insurance accompanying deposits of free credit balances through the Modified and Tiered Cash Sweep Programs, and failed to disclose that shares of money market mutual funds are "universally accepted as highly safe investments . . . because of the quality and duration of the investments made . . . with little risk of default." (*Id.* ¶ 6.)

Plaintiffs allege that these statements, including the comparisons, were deceptive, false, and misleading because: (1) in reality, Defendants "provided no alternative vehicles for uninvested cash . . . other than allowing [customers'] cash to sit idle earning no interest at all" (*id.* ¶ 104); (2) the Cash Sweep Programs were "rigged to ensure that uninvested cash went to [Defendants]" (*id.* ¶ 172); and (3) "no *bona fide* 'Financial Advisor' would recommend — much less implement — such an investment . . . in place of money market funds" (*id.*).

c. Analysis

In addition to the above-described allegations regarding misrepresentations, *see supra* Part II.B.3.b, Plaintiffs also allege that Defendants' failure to disclose the amount of their profits from the Cash Sweep Programs was materially misleading. The Court first addresses Plaintiffs' five categories of misrepresentations, and then analyzes the alleged omission regarding Defendants' profits. For the reasons stated below, these allegations are insufficient to adequately plead a claim for common-law fraud.

(1) Defendants' Alleged Misrepresentations

Plaintiffs have failed to articulate a plausible theory under which the five categories of statements they have identified could be materially misleading to a reasonable investor. Plaintiffs' first two categories of alleged misrepresentations — those relating to Defendants' statements about their relationships with customers and Defendants' Investor Rights Statements — constituted nothing more than puffery. The remaining three categories, which relate to the benefits and alternatives for the Modified and Tiered Cash Sweep Programs, are not materially misleading.

As to the first category of alleged misrepresentations, Defendants' advertisements regarding their aspirations for customer relationships were immaterial puffery. *See, e.g., Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362 (AGS), 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996) ("'Puffing' has been described as making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon

which he or she could rely." (internal quotation omitted)). "The allegation that the customer was told that the broker's primary purpose was to make profits for the customer is nothing more than the common puff of a salesman and must be looked at from the point of view of a reasonable person. . . . The law does not give premiums for naivete." *Bowman v. Hartig*, 334 F. Supp. 1323, 1328 (S.D.N.Y. 1971); *see also The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 505-06 & n.10 (S.D.N.Y. 1989) (dismissing fraud claim because manufacturer's advertisements about "relationships that last a lifetime" constituted "puffing"); *Frota*, 639 F. Supp. at 1190 (characterizing as puffery a series of alleged misrepresentations that the "plaintiffs' account would be 'properly and prudently managed,' . . . [and] that [the defendant] was not only [the] plaintiffs' broker, but their 'friend, confidant and financial advisor' and a person whom [the] plaintiffs 'could trust to look after their interests'"); *cf. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (characterizing as puffery the defendants' statements regarding "high standards of integrity and credit-risk management" because "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements"). Therefore, this first category of alleged misrepresentations cannot serve as the basis for Plaintiffs' fraud claim.

With respect to the second category of alleged misrepresentations, Plaintiffs appear to acknowledge in the SAC that Defendants' Investor Rights Statements either quote verbatim, or mimic, the 2004 "Best Practices" recommendations of the Securities Industry

and Financial Markets Association regarding "Investor Rights." (*See* SAC ¶ 88 (alleging that the Merrill Lynch Defendants' statements regarding their "Commitment to Clarity" were "based on a Securities Industry Association 2004 statement"); *id.* ¶ 183 (alleging that Smith Barney's statement titled "Our Mutual Commitment" was "modeled from a 'Statement of Investor Rights and Responsibilities' adopted by the Board of the Securities Industry Association in 2004").) Therefore, Plaintiffs have not alleged that the Investor Rights Statements were anything more than an industry-wide set of maxims that were compiled by a trade group. *Cf. ECA*, 553 F.3d at 206. As with Defendants' advertisements, these statements did not contain facts or concrete promises of future performance that were specific to the relationship between the parties. *See Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 530 (S.D.N.Y. 2001) ("Terms [that] . . . do not set forth a concrete representation as to the company's future performance . . . are in the nature of commercial puffery and cannot form the basis for a fraud claim . . . ."). The "vigorous promotion" of a commercial venture "without more, is not a misrepresentation." *Id.* Therefore, the Court concludes that Plaintiffs' second category of alleged misstatements is immaterial as a matter of law.[15]

_____

[15]   Plaintiffs have also failed to specifically allege that they actually read and relied on Defendants' advertisements and Investor Rights Statements. Rather, they offer the conclusory assertion that "Plaintiffs and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment." (SAC ¶ 266.) This failure is fatal to Plaintiffs' common-law fraud claim based on the first two categories of alleged misrepresentations by Defendants. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 258 (S.D.N.Y.

With respect to Plaintiffs' remaining three categories of alleged misrepresentations, the Court concludes that Defendants' disclosures regarding the nature and mechanics of their Cash Sweep Programs were not materially misleading. As to the third category — Defendants' benefits from the Sweep Programs — Plaintiffs contend that these statements "failed to meaningfully disclose the true benefits" that Defendants derived from the Cash Sweep Programs. (SAC ¶ 243.) However, that assertion is belied by the text of the disclosures Plaintiffs have included in the SAC, which reveal that Defendants disclosed the precise manner in which they would profit from the Cash Sweep Programs. For example, the Wachovia Defendants disclosed that:

> Wachovia Bank earns net income from the difference between the interest it pays on deposit accounts, such as the Bank Deposit Sweep Option, and the income it earns on loans, investments and other assets. . . . As a result of the fees and benefits described above, the Bank Deposit Sweep Option may be significantly more profitable to us than other available Cash Sweep Options.

(*Id.* ¶ 242.) The remaining four groups of Defendants made substantially similar disclosures, which are also detailed in the SAC. (*See id.* ¶ 105 (Merrill Lynch); *id.* ¶ 147 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).) Each group of Defendants explicitly explained the manner in which they would profit from the Cash Sweep Programs. Therefore, the Court concludes that Defendants' statements regarding the benefits they derived from the Cash Sweep Programs were not materially misleading.

Similarly, Defendants' disclosures regarding customers' potential benefits from, and alternatives to, the Cash Sweep Programs were not materially misleading. Plaintiffs do not allege that Defendants' disclosures regarding the FDIC insurance on customer deposits at affiliated Sweep Banks contained actual misrepresentations. (*See, e.g.*, *id.* ¶ 99.) Rather, they contend that Defendants overemphasized the advantages of FDIC insurance. However, that contention is not supported by the documents upon which Plaintiffs rely. For example, in the SAC, under the heading "Merrill Lynch Deceptive Description Of Bank Deposit FDIC Insured Option," Plaintiffs identify as misleading the Merrill Lynch Defendants' disclosure that "money market funds are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency. Although the [money market] funds seek to preserve the value of your investment at $1 per share, it is possible to lose money by investing in the funds." (*Id.* ¶ 99.) These

---

1999) (finding that the plaintiffs had not adequately pleaded reliance because "[d]espite the [plaintiffs'] catch-all allegation that [they] relied upon [the defendant's] statements . . . , the [plaintiffs] never venture[] to actually plead facts that underlie this reliance"); *see also Tuosto v. Philip Morris USA Inc.*, No. 05 Civ. 9384 (PKL), 2007 WL 2398507, at *9 (S.D.N.Y. Aug. 21, 2007) (finding that the plaintiff had not adequately pleaded reliance because the complaint did "not allege that [the plaintiff] saw . . . any specific . . . advertisement, [but] simply that [the defendant's] advertisements were widely circulated and intended to mislead"); *Bennett*, 2007 WL 1732427, at *9 ("In this case . . . , [the] plaintiffs have not alleged that they read any of the financial statements at issue, much less that they actually relied on them."). Therefore, as to the first two categories of alleged misrepresentations by Defendants, Plaintiffs' fraud claim is dismissed for this reason as well.

disclosures were specifically called for by the NYSE (*see id.* ¶ 77; NYSE Info. Mem. at 3-4, 6), and Plaintiffs do not contest their veracity. Other than the bold typeface that Plaintiffs have used in the SAC, there is no basis for their conclusory allegation that Defendants "emphasiz[ed]" the availability of FDIC insurance to customers (*see, e.g.*, SAC ¶ 99), and there is nothing misleading about the statements themselves.

Moreover, Plaintiffs' argument that "no *bona fide* disinterested 'Financial Advisor' would ever recommend" enrolling in the Modified or Tiered Cash Sweep Programs misstates the nature of the Brokerage Defendants' obligations to their customers. (*Id.* ¶ 144 (Charles Schwab); *see also id.* ¶ 100 (Merrill Lynch); *id.* ¶ 167 (Morgan Stanley); *id.* ¶ 196 (Citigroup); *id.* ¶ 246 (Wachovia).) Plaintiffs have not alleged that they sought, or that Defendants promised to provide, "*bona fide* investment advisory services." Although each set of Defendants recommended that their customers either contact a "Financial Advisor" regarding the Cash Sweep Programs or examine alternatives to the Programs on their own, no Plaintiff alleges that he or she did so. *See supra* Part II.B.2.b. Therefore, Plaintiffs' broad, categorical conjecture regarding the content of investment advice that they *might* have received from Defendants' Financial Advisors, *if* they had sought such advice, does not make these disclosures materially misleading.

There are also no factual allegations in the SAC that Defendants hindered Plaintiffs' investigation of suitable alternatives to the Cash Sweep Programs. Plaintiffs do allege that it would have been "pointless" to consult Defendants' "Financial Advisors" because

they received commissions based on the amount of funds deposited at affiliated Sweep Banks. (SAC ¶ 104.) Although the fact that the Brokerage Defendants' employees received commissions in connection with the Cash Sweep Programs was likely material, *see, e.g.*, *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000), the SAC makes clear that Defendants disclosed the commissions structure. (*See* SAC ¶ 114 (Merrill Lynch); *id.* ¶ 149 (Charles Schwab); *id.* ¶ 173 (Morgan Stanley); *id.* ¶ 197 (Citigroup); *id.* ¶ 242 (Wachovia).) Accordingly, the Court concludes that Defendants' disclosures about the alternatives and benefits available to customers from the Cash Sweep Programs were not materially misleading.

(2) Defendants' Alleged Failure to Disclose Profits

Plaintiffs also allege that, notwithstanding Defendants' disclosures regarding the manner in which they profited from the Cash Sweep Programs, Defendants' failure to disclose the actual amount of their profits was misleading. (*See, e.g., id.* ¶ 243.) The Court disagrees, and concludes that these alleged omissions were also immaterial as a matter of law.

Plaintiffs repeatedly allege, in substance, that Defendants "failed to even attempt to disclose the billions of dollars in . . . profit from the use of clients' uninvested cash at their clients' expense . . . ." (SAC ¶ 106 (emphasis omitted).) However, because this broad contention sits in significant tension with Plaintiffs' other allegations in the SAC, the Court is not obligated to accept it as true. *See, e.g., Koulkina v. City of New York*, No. 06 Civ. 11357 (SHS), 2009 WL 210727, at *6 (S.D.N.Y. Jan. 29, 2009) ("[T]he 'Court [ ] is

not obliged to reconcile plaintiffs' own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'" (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)) (first alteration in original)). Specifically, Plaintiffs also allege that, rather than concealing the profits from the Cash Sweep Programs, Defendants touted these earnings to the public. According to Plaintiffs, Defendants did so in media releases and press conferences (*see, e.g.*, SAC ¶¶ 92, 225), as well as in contemporaneous SEC filings (*see, e.g.*, SAC ¶¶ 8, 68, 70). Plaintiffs further allege that Defendants' profits from the Cash Sweep Programs were the subject of both press coverage and publicly available industry analysis. (*See, e.g.*, *id.* ¶¶ 71, 94.) Thus, in light of these allegations, Plaintiffs' argument must be construed as a challenge to Defendants' failure to specifically identify the extent of their profits in disclosures transmitted directly to their retail brokerage clients.

The Court concludes that this more narrow alleged omission is immaterial as a matter of law. In *Levitin v. Painewebber, Inc.*, the Second Circuit affirmed the dismissal of a putative class action brought by the holder of a brokerage account against a broker-dealer that had effected short-sale transactions on the plaintiff's behalf. *See* 159 F.3d at 700-01. The plaintiff alleged that the defendant had improperly used the collateral posted by customers in connection with short sales for its own financial benefit. *See id.* Specifically, the plaintiff alleged that "'[t]ypically,'" the defendant "'will not inform its customers of . . . the interest or profits . . . [earned] from using the customer's property.'" *Id.* at 701 (quoting the

complaint). Reviewing these allegations, the *Levitin* court held that "[a]n investor who is ignorant of the fact that free cash or securities may be used to earn interest or other kinds of financial returns is simply not reasonable by any measure." *Id.* at 702. The court further noted that the plaintiff "might as reasonably complain of [the defendant's] failure to disclose that the interest it pays to investors on money market accounts is less than that earned by [the defendant] on the amount in the account." *Id.*

Plaintiffs seek greater disclosures than those sought by the plaintiffs in *Levitin*. There, the plaintiff argued that the defendant had failed to "disclose profits on the posted collateral." *Levitin*, 159 F.3d at 699. Here, as discussed above, *see supra* Part II.B.3.c, Defendants disclosed not only that they derived financial benefits from the Cash Sweep Programs, but also that the extent of their profits was governed by the difference between the interest rate paid to customers, and the rate of return Defendants earned by using their customers' free credit balances for other commercial purposes. (*See* SAC ¶¶ 105, 147, 173, 197, 242.) Plaintiffs argue that they were nevertheless entitled to additional disclosures regarding the precise amounts of profits that Defendants earned. Under *Levitin*, the failure to disclose such information in this context, absent a breach of some other duty to do so, is not actionable. Indeed, it would have been difficult, if not impossible, for Defendants to quantify in their disclosures to retail brokerage investors, *in advance*, the amount of profits they would earn through the Cash Sweep Programs. The law does not require such speculation. Therefore, in light of the disclosures made by Defendants, which Plaintiffs acknowledge, the Court concludes that the alleged omissions relating to the

31

amount of Defendants' profits are immaterial as a matter of law.

In sum, the Court has carefully reviewed the disclosures by Defendants regarding the Cash Sweep Programs. This review has included both the specific statements identified by Plaintiffs, and, because the documents are integral to the pleading, the full-length disclosure documents referenced in the SAC. Having done so, the Court concludes that: (1) Plaintiffs have failed to identify a materially false or misleading statement regarding Defendants' Modified and Tiered Cash Sweep Programs; (2) Defendants' disclosures regarding their respective Cash Sweep Programs would not have misled reasonable investors; and (3) the alleged omission of Defendants' exact amount of profits from these Programs was immaterial as a matter of law in light of the other disclosures. Accordingly, for these reasons, Plaintiffs' common-law fraud claim is dismissed pursuant to Rule 12(b)(6).

4. Breach of Fiduciary Duty and Aiding and Abetting a Breach of Fiduciary Duty

Plaintiffs bring a claim for breach of fiduciary duty against all Defendants (SAC ¶¶ 277-85), as well as a claim for aiding and abetting a breach of fiduciary duty against the Parent and Sweep Bank Defendants (*id.* ¶¶ 286-91). In support of these claims, Plaintiffs argue that the SAC "clearly pleads a breach of the duty of loyalty through the implementation of the" Modified and Tiered Cash Sweep Programs. (Pls.' Mem. at 26.)

However, Plaintiffs have offered no allegations that, if proven, would establish the existence of a fiduciary duty owed by the Parent and Sweep Bank Defendants to Plaintiffs. Moreover, as to the Brokerage Defendants, although the law recognizes a limited duty owed by brokers to the holders of brokerage accounts, that duty was not breached through the actions that these Defendants are alleged to have taken in connection with the Cash Sweep Programs. Thus, Plaintiffs have not stated a claim for a breach of fiduciary duty, and in the absence of sufficient allegations of a primary breach, the claim for aiding and abetting a breach of fiduciary duty must also fail. Accordingly, for the reasons stated below, Plaintiffs' claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are dismissed.

a. Applicable Law

Under New York law, a claim for breach of fiduciary duty has three elements: "'(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (N.Y. 1981)).

"A fiduciary relationship exists . . . 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (quoting *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st Dep't 1987)) (alteration in original). However, "when parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *Pan Am. Corp. v. Delta Air*

*Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994) (internal quotation omitted). In this case, the relationship between a brokerage customer and a broker as to free credit balances is that of a debtor and creditor. *See Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996). Such a relationship "is not by itself a fiduciary relationship although the addition of 'a relationship of confidence, trust, or superior knowledge or control' may indicate that such a relationship exists." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *Delta Air Lines*, 175 B.R. at 511).

b. Breach of Fiduciary Duty

With respect to the Parent and Sweep Bank Defendants, Plaintiffs have not sufficiently alleged the existence of a fiduciary duty. Instead, Plaintiffs offer only the conclusory assertion that the "Defendants," collectively, "through their agents and representatives, held themselves out as financial advisors to Plaintiffs and other Class members, and as such owed fiduciary duties to Plaintiffs and the other Class members." (SAC ¶ 278.) Similarly, in their opposition to Defendants' motions, Plaintiffs present no independent arguments in support of this claim against the Parent and Sweep Bank Defendants, and instead refer to "Defendants" *en masse*. (*See* Pls.' Mem. at 23-32.) However, Plaintiffs cannot maintain a claim for breach of fiduciary duty against these Defendants simply by levying a series of general allegations regarding their brokerage accounts.

"[A]bsent an allegation of a special relationship, mere assertions of 'trust and confidence' are insufficient to support a claim of a fiduciary relationship." *Abercrombie v.*

*Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006). "Thus, for example, 'the fact that one party trusts the other is insufficient to create a fiduciary relationship.'" *Id.* (quoting *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 797 (N.D. Ill. 1997)). Other than the fact that Plaintiffs' free credit balances were deposited *by the Brokerage Defendants* at affiliated Sweep Banks, there are no allegations in the SAC regarding interactions — indirect or otherwise — between Plaintiffs and either the Parent or Sweep Bank Defendants. Therefore, Plaintiffs' breach of fiduciary claim as to these Defendants is dismissed.

Nor are Plaintiffs' allegations sufficient to state a claim for breach of fiduciary duty against the Brokerage Defendants. As noted, under New York law, the "'mere existence of a broker-customer relationship is not proof of its fiduciary character.'" *Bissell*, 937 F. Supp. at 246 (quoting *Rush v. Oppenheimer & Co.*, 681 F. Supp. 1045, 1055 (S.D.N.Y. 1988)). As discussed in relation to Plaintiffs' IAA claims, *see supra* Part II.B.2.b, there are no allegations in the SAC, or in the documents that have been deemed integral to the pleading, tending to suggest that there was anything but a nondiscretionary brokerage relationship between Plaintiffs and the Brokerage Defendants. Indeed, each Plaintiff specifically alleges that he or she maintained one or more "brokerage" accounts (SAC ¶¶ 30-36), and Plaintiffs affirmatively argue in their opposition to Defendants' motions that "in fact, they had nothing more than an '[arms]-length' relationship — the same as with any commercial vendor." (Pls.' Mem. at 40.)

The Second Circuit has offered cogent guidance on the legal obligations that arise out of such a relationship:

> [A] broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis.  The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. . . .  The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.

*de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002); *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940-41 (2d Cir. 1998); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 193 (S.D.N.Y 2008); *Crigger v. Fahnestock & Co., Inc.*, No. 01 Civ. 7819 (JFK), 2003 WL 22170607, at *10 (S.D.N.Y. Sept. 18, 2003) ("Where the broker is not recommending investments to the client, but rather acting primarily as a banker . . . , a fiduciary duty is not created."); *Bissell*, 937 F. Supp. at 246 ("In the absence of discretionary trading authority delegated by the customer to the broker — and none is alleged in the case at bar — a broker does not owe a general fiduciary duty to his client.").

Thus, "absent an express advisory contract, there is no fiduciary duty on [the] part of [the] broker-dealer unless the customer is infirm or ignorant of business affairs." *Kwiatkowski*, 306 F.3d at 1308-09 (internal quotation omitted).  A fiduciary duty owed by the Brokerage Defendants "could arise only if the law, under the circumstances of this case, imposes on [them] some special duty as a result of the relationship between the parties — that is, if [Plaintiffs'] account[s] deviated from the usual nondiscretionary account in a way that create[d] a special duty beyond that ordinary duty of reasonable care that applies to a broker's actions in nondiscretionary accounts." *Id.* at 1308.  Such "transformative 'special circumstances'" include situations that "render the client dependent," such as "a client who has impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that *de facto* control of the account is deemed to rest in the broker." *Id.*  The SAC lacks any such allegations.

Notwithstanding this fact, Plaintiffs argue that the language of Defendants' advertisements was sufficient to create a fiduciary relationship as to *all* Defendants. (Pls.' Mem. at 28.)  This argument is unavailing for a number of reasons.  First, the advertisements quoted in the SAC promote the full range of services offered by Defendants, which included, but was not limited to, retail brokerage accounts. (*See* SAC ¶ 97 (Merrill Lynch); *id.* ¶¶ 123, 126-27 (Charles Schwab); *id.* ¶ 155 (Morgan Stanley); *id.* ¶ 178 (Citigroup); *id.* ¶ 214 (Wachovia).)  The fact that Defendants made known to the public that they offered discretionary brokerage accounts and other types of investment advice is only relevant here to the extent that Plaintiffs enrolled in or otherwise sought those services.  *See Brinsights, LLC v. Charming Shoppes of*

*Delaware, Inc.*, No. 06 Civ. 1745 (CM), 2008 WL 216969, at \*8 (S.D.N.Y. Jan. 16, 2008) ("Where the parties do not create their own relationship of higher trust, courts should not fashion the stricter duty for them."). No Plaintiff alleges that he or she sought such services.

Second, fiduciary relationships — like investment advisory relationships under the IAA — are personal and context-specific. *See, e.g.*, *Abercrombie*, 438 F. Supp. 2d at 274 ("[I]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." (internal quotation omitted)); *Europacific Asset Mgmt. Corp. v. Tradescape Corp.*, No. 03 Civ. 4556 (PKL), 2005 WL 497787, at \*9 (S.D.N.Y. Mar. 2, 2005) ("[F]inding a breach of fiduciary duty requires finding that a fiduciary relationship existed *between the parties*." (emphasis added)). However, no Plaintiff alleges that he or she read the advertisements and promotional materials cited in the SAC, and there are almost no specific allegations regarding any of Plaintiffs' relationships with the Brokerage Defendants.

Finally, "the fact that the broker . . . represents, as part of his sales pitch, that he is particularly well qualified to [offer investment advice] does not alter the limited scope of the broker's legally enforceable obligations." *Stewart v. J.P. Morgan Chase & Co.*, No. 02 Civ. 1936 (MHD), 2004 WL 1823902, at \*12 (S.D.N.Y. Aug. 16, 2004); *see also Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 2000 WL 781081, at \*20 (S.D.N.Y. June 16, 2000) ("That

plaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist." (internal quotation omitted)). As discussed in more detail in relation to Plaintiffs' common-law fraud claim, *see supra* Part II.B.3.c.(1), no reasonable investor would expect that these vague and general advertisements created any sort of extra-contractual relationship extending beyond the terms specified in Plaintiffs' account agreements.

Plaintiffs' claim fares no better if the analysis is narrowed to focus on the Brokerage Defendants' use of their customers' free credit balances. "Federal regulation of . . . broker utilization of customer funds is extensive." *Levitin*, 159 F.3d at 705. However, "[t]he SEC has . . . recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts is that of debtor and creditor." *Bissell*, 937 F. Supp. at 246 (citing Adoption of Rule 15c3-2 under the Securities Exchange Act of 1934, Exchange Act Release No. 34-7325 (May 27, 1964)); *cf. Newbro v. Freed*, 409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006) ("[A] claim against a broker for converting funds in a free credit balance fails for the same reason as a customer's claim against a bank — the funds at issue arise from a debtor-creditor relationship and are not segregated vis-à-vis other accounts at the brokerage firm.").[16] Plaintiffs have not

---

[16] More recently, in proposed amendments to the SEC regulations governing free credit balances, *see* 17 C.F.R. §§ 240.15c3-2, 15c3-3, the SEC offered a similar view: "[f]ree credit balances constitute money that a broker-dealer owes its customers." SEC, Amendments to Financial Responsibility Rules for Broker-Dealers, Exchange Act Release No. 34-55431 at 80 (Mar. 9, 2007) (emphasis added), *available at*

alleged that this debtor-creditor relationship resulted from anything more than an arms-length transaction relating to the investments that they initiated.

By definition, free credit balances existed in Plaintiffs' brokerage accounts because Plaintiffs chose not to invest these funds and instead left them idle in their accounts. *See* 17 C.F.R. § 240.15c3-3(a)(8); *see also* Amendments to Financial Responsibility Rules for Broker-Dealers, 72 Fed. Reg. 12,862, 12,866 (proposed Mar. 19, 2007). Nevertheless, Plaintiffs acknowledge that they earned positive rates of interest on these funds. (*See* SAC ¶¶ 30-36.) However, Plaintiffs suggest that they were entitled to an additional service from the Brokerage Defendants — namely, ongoing advice regarding how to *maximize* returns on free credit balances. Plaintiffs present this argument notwithstanding the fact that the specific Cash Sweep Programs at issue were governed by the terms of their account agreements and the amendments thereto. No such service was included in Plaintiffs' brokerage accounts, and the Brokerage Defendants had no fiduciary obligation to provide it. *See, e.g.*, *Kwiatkowski*, 306 F.3d at 1311 ("The general rule . . . is that . . . brokers do not owe nondiscretionary clients ongoing advisory or account-monitoring duties, such

_____

http://www.sec.gov/rules/proposed/2007/34-55431.pdf. In light of this authority, Plaintiffs' reliance on *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991), is misplaced. Plaintiffs quote *Chestman* at length in their opposition papers (*see* Pls.' Mem. at 24), including the court's remark that "[a] fiduciary relationship involves *discretionary authority*," *Chestman*, 947 F.2d at 569 (emphasis added). Here, by contrast, the free credit balances at issue were swept from *nondiscretionary* brokerage accounts. In that context, the Brokerage Defendants acted as *debtors*, not fiduciaries.

as the duty to warn of changes in market conditions or other information that can impact the client's investments."); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 535 (S.D.N.Y. 2008) ("[I]t is well-established Second Circuit law that the fiduciary duty in the broker/customer relationship is only to 'the narrow task of consummating the transaction requested.'" (quoting *Press*, 166 F.3d at 536)). Thus, the Brokerage Defendants were not required to notify Plaintiffs of opportunities to improve their earnings on uninvested funds.

Nevertheless, Plaintiffs are correct that they were owed — to some extent — a duty of reasonable care. *See Kwiatkowski*, 306 F.3d at 1305 ("[A] duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts."). "[T]he scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Bissell*, 937 F. Supp. at 246 (internal quotation omitted). Specifically, "[o]n a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale." *Kwiatkowski*, 306 F.3d at 1302. The SAC does not identify a breach of this transaction-specific duty. Although it is possible that the "failure to give information material to a particular transaction" may support a claim against a broker by a client with a nondiscretionary account, *id.* at 1306, the Court has already concluded that Plaintiffs have not identified a false or materially misleading statement or omission by any Defendant relating to enrollment in the Cash Sweep Programs. *See supra* Part II.B.3.c. Moreover, Plaintiffs do not allege that any of

the transactions that were conducted in connection with Defendants' Cash Sweep Programs were erroneously or negligently executed. Nor do Plaintiffs contend that they either received unsound investment recommendations from the Brokerage Defendants, or sought the investment advice that was one of the available services offered by them.

Therefore, although the Court agrees with Plaintiffs that cases such as *Kwiatkowski* do not demonstrate as a matter of law that every brokerage relationship lacks fiduciary characteristics, Plaintiffs have not alleged facts or circumstances that, if proven, would establish that the Brokerage Defendants breached the limited duties that they owed to Plaintiffs in regard to their brokerage accounts. Accordingly, Plaintiffs' claim for breach of fiduciary duty is dismissed.

### c. Aiding and Abetting

"Under New York law, '[a] plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show . . . the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party . . . .'" *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006) (quoting *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066, 1082 (S.D.N.Y. 1987)); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) ("'[A] person knowingly participates in a breach of fiduciary duty only when he or she provides substantial assistance to the primary violator.'" (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (1st Dep't 2003)); *Kottler v. Deutsche Bank AG*, 607 F. Supp. 447, 466 (S.D.N.Y. 2009). "Aiding and abetting liability arises only when [the] plaintiffs'

injury was 'a direct or reasonably foreseeable result' of the complained-of conduct." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996) (quoting *Morin v. Trupin*, 711 F. Supp. 97, 112 (S.D.N.Y. 1989)).

Plaintiffs have not identified a "primary violator" because they have not adequately pleaded a claim for breach of fiduciary duty. Such allegations are a predicate to their claims against the Parent and Sweep Bank Defendants for aiding and abetting a breach of fiduciary duty. *See Kottler*, 607 F. Supp. 2d at 466. Accordingly, this claim is likewise dismissed.

### 5. Negligent Misrepresentation

Plaintiffs' negligent misrepresentation claim is nearly identical to their fraud claim. In addition to the Court's above-stated conclusions regarding the alleged misrepresentations and omissions identified in the SAC, Plaintiffs have not sufficiently alleged the "reasonable reliance" element of this claim. Accordingly, for the reasons set forth below, Plaintiffs' negligent misrepresentation claim is dismissed.

### a. Applicable Law

"Negligent misrepresentation 'involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement.'" *Carroll v. Leboeuf, Lamb, Greene & MaCrae, LLP*, --- F. Supp. 2d ----, No. 05 Civ. 391 (LAK), 2009 WL 1575213, at *3 (S.D.N.Y. June 5, 2009) (quoting *Mia Shoes, Inc. v. Republic Factors, Corp.*, No. 96 Civ. 7974 (TPG), 1997 WL 525401, at *3 (S.D.N.Y. Aug. 21, 1997)). Specifically, to state a claim for negligent

misrepresentation under New York law, a plaintiff must adequately plead five elements:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *see also Eternity Global Master Fund*, 375 F.3d at 188; *Kimmell v. Schaeffer*, 89 N.Y.2d 257, 263-64 (N.Y. 1996)

### b. Analysis

Plaintiffs have not adequately pleaded a claim for negligent misrepresentation. First, as discussed above in relation to their fraud claim, *see supra* Part II.B.3.c, the statements and omissions identified by Plaintiffs were neither false nor materially misleading. Absent such allegations, Plaintiffs cannot meet the elements of a negligent misrepresentation claim. *See Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318 (LAP), 2005 WL 736217, at *6 (S.D.N.Y. Mar. 30, 2005) (dismissing a fraud claim because the "[d]efendants' allegedly fraudulent statements [we]re not actionable" and dismissing an accompanying negligent misrepresentation claim because it "suffer[ed] from the same weakness"). Therefore, this pleading deficiency alone requires dismissal

of Plaintiffs' negligent misrepresentation claim.

Second, Plaintiffs' allegations are insufficient to support an inference of reasonable reliance. The New York Court of Appeals has held that three factors are relevant to this element of a negligent misrepresentation claim: (1) whether the defendant "held or appeared to hold unique or special expertise"; (2) whether there was "a special relationship of trust or confidence" between the parties; and (3) "whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell*, 89 N.Y.2d at 264. "[W]here . . . a 'special relationship' is nowhere pled, and the allegations with respect to the other *Kimmell* factors are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6).'" *Eternity Global Master Fund*, 375 F.3d at 188.

While Plaintiffs have sufficiently alleged that the Brokerage Defendants possessed special expertise in the area of retail brokerage investment services, the latter two *Kimmell* factors are not adequately supported by the SAC. "Although a broker-client relationship can evolve into a special relationship, the mere fact that [the defendant] and the plaintiffs had a broker-client relationship does not in and of itself create a special or fiduciary relationship." *Crigger*, 2003 WL 22170607, at *10 (internal citation omitted). The Court has already discussed at length the SAC's allegations regarding the relationship between Plaintiffs and Defendants in regard to Plaintiffs' IAA and breach of fiduciary duty claims. *See supra* Parts II.B.2, II.B.4. As stated above, Plaintiffs' allegations do not support an inference that there existed

anything more than a broker-client relationship. Thus, Plaintiffs have not alleged that they had a "special relationship" with the Brokerage Defendants that is sufficient to serve as the basis for a negligent misrepresentation claim.

Moreover, Plaintiffs have not alleged that the Brokerage Defendants were aware of the uses to which their statements were allegedly being put. Plaintiffs' allegations do not support an inference that Defendants either intended — or could have reasonably anticipated — that their advertisements and Investor Rights Statements would be construed by reasonable investors as containing investment advice. *See Eternity Global Master Fund*, 375 F.3d at 187-88 ("As in the case of fraud, an alleged misrepresentation must be factual and not 'promissory or related to future events.'" (quoting *Hydro Investors*, 227 F.3d at 20)). Similarly flawed are Plaintiffs' allegations regarding the Brokerage Defendants' representations in their account agreements and the disclosure statements regarding the Cash Sweep Programs. As Plaintiffs acknowledge in the SAC, each Brokerage Defendant encouraged customers to investigate the Cash Sweep Programs and indicated that, if customers wished to seek advice regarding cash management strategies, their "Financial Advisors" were available to discuss additional options. (*See* Pls.' Merrill Lynch Decl. Ex. 7 at 1; Pls.' Morgan Stanley Decl. Ex. 9 at 3; Pls.' Citigroup Decl. Ex. 8 at 12; Pls.' Charles Schwab Decl. Ex. 14 at 9; SAC ¶ 237 (Wachovia).) Therefore, Plaintiffs have not alleged that the Brokerage Defendants were aware that these statements and disclosures would be relied on by brokerage customers as investment advice regarding the merits of the respective Cash

Sweep Programs. In light of this conclusion, and because the allegations in the SAC do not support an inference that a "special relationship" existed between the Brokerage Defendants and Plaintiffs, Plaintiffs have not adequately pleaded justifiable reliance on Defendants' alleged misrepresentations.

Accordingly, because Plaintiffs have not identified material misrepresentations or omissions by Defendants, and they have not alleged justifiable reliance, their negligent misrepresentation claim is dismissed.

### 6. Negligence Against the Brokerage Defendants

Plaintiffs' negligence claim against the Brokerage Defendants "repeat[s] and reiterate[s]" all of the allegations that have been previously discussed herein (SAC ¶ 292), and alleges that the Brokerage Defendants "breached their duty of care" by, *inter alia*, "placing Plaintiffs' . . . uninvested monies into bank sweep accounts at substantially below money market rates . . ." (*id.* at 294). In opposition to Defendants' motions, Plaintiffs argue that the Brokerage Defendants breached a "duty of care" by "fail[ing] to evaluate *suitability to invest*" and by "placing their clients in low-interest-bearing bank accounts instead of high-yielding safe investments . . . ." (Pls.' Mem. at 50-51 (emphasis in original).)

However, as Defendants point out, Plaintiffs overstate the scope of the duty they were owed by the Brokerage Defendants, and they have failed to allege that Defendants breached their actual legal obligations. Accordingly, for the reasons stated below, Plaintiffs' negligence claim is dismissed.

### a. Applicable Law

"Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

### b. Analysis

Plaintiffs contend that the SAC contains allegations regarding "multiple layers of 'duties,'" including a fiduciary duty, a duty arising out of the NASD's suitability rules, "a duty arising from each of the Defendants' 'Codes of Ethics,'" and "a duty to implement matters entrusted to them . . . in good faith and with reasonable care and not in a manner whereby Defendant acted contrary to their express representations . . . ." (Pls.' Mem. at 49-50.) However titled, the scope of the purported duty that Plaintiffs seek to enforce through their negligence claim is overly broad.

With respect to the first "layer" identified by Plaintiffs — a general fiduciary duty — the Court has already concluded that the SAC does not allege facts sufficient to give rise to such a relationship between Plaintiffs and the Brokerage Defendants. *See supra* Parts II.B.2.b, II.B.4.b. Second, alleged violations of self-regulatory organizations' ("SROs") promulgations, such as the NASD's suitability rule (*see* SAC ¶ 294) or the "best practices" identified in the NYSE Information Memo (*see id.* ¶¶ 75-78), did not alter the scope of the duties owed by the Brokerage Defendants to Plaintiffs. Such rules may not be enforced by private litigants through civil actions. *See, e.g.*, *Brady v. Calyon Sec. (USA)*, 406 F.

Supp. 2d 307, 312 (S.D.N.Y. 2005). At most, alleged violations of these rules are relevant to the *breach* element of Plaintiffs' negligence claim. *See Kwiatkowski*, 306 F.3d at 1311 ("It may be that noncompliance with internal standards could be evidence of a failure to exercise due care, assuming however a duty as to which due care must be exercised."). The mere existence of the NASD suitability rule, however, did not expand the duty that the Brokerage Defendants owed to their brokerage customers.

Nor did Defendants' Investor Rights Statements give rise to an ongoing duty to provide investment advice or maximize the income Plaintiffs earned from their uninvested free credit balances. *See Stewart*, 2004 WL 1823902, at *13 ("As for the argument that [a brokerage defendant] assumed extra-contractual duties by virtue of its promised relationship with plaintiff, again the theory is unsupported by . . . the law."). Plaintiffs provide no authority for the assertion that promotional documents and advertisements should be deemed to give rise to a heightened duty of care, and, as has been discussed throughout this decision, the argument is unpersuasive. As in *Kwaitkowski*, the obligations that Plaintiffs would foist upon the Brokerage Defendants "presuppose[] an ongoing duty of reasonable care (*i.e.*, that the broker has obligations between transactions)." 306 F.3d at 1306. However, based on the allegations in the SAC, the Brokerage Defendants owed Plaintiffs no such duty.

As stated in the analysis of Plaintiffs' breach of fiduciary duty claim, *see supra* Part II.B.4.b, the Brokerage Defendants did owe Plaintiffs a transaction-specific duty of care. *See Kwiatkowski*, 306 F.3d at 1305; *Bissell*,

937 F. Supp. at 246.  Here as well, however, Plaintiffs have failed to attribute any conduct to the Brokerage Defendants that could plausibly be deemed a breach of that duty. "[I]n the ordinary nondiscretionary account" — and Plaintiffs have alleged no more — "the broker's failure to offer information and advice between transactions cannot constitute negligence." *Kwiatkowski*, 306 F.3d at 1306. Therefore, although the Brokerage Defendants owed Plaintiffs a duty of care with respect to both the transactions they executed on their behalf and any investment advice that they provided to them, Plaintiffs' allegations are insufficient as a matter of law to satisfy the "breach" element of their negligence claim.  Accordingly, this claim is dismissed.

### 7. N.Y. General Business Law § 349

With respect to their claim under § 349, Plaintiffs argue that Defendants deceived consumers by issuing "false and misleading statements" that were "uniform and directed at all current and potential clients through the public media, including the Internet." (Pls.' Mem. at 64.)  For the reasons set forth below, the Court finds these contentions unavailing. Accordingly, Plaintiffs' § 349 claim is dismissed.

#### a. Applicable Law

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349.  There are three elements to a private claim alleging deceptive practices under the statute:   "(1) that the act, practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was

misleading in a material respect; and (3) that the plaintiff was injured as a result of the deceptive act, practice, or advertisement." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 444 (S.D.N.Y. 2005); *see also Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (N.Y. 2000).  "An act is deceptive within the meaning of the New York statute only if it is likely to mislead a reasonable consumer."  *Marcus v. AT&T*, 138 F.3d 46, 64 (2d Cir. 1998).

#### b. Analysis

Plaintiffs' § 349 claim relies exclusively on their allegations regarding misrepresentations and omissions. (*See* SAC ¶ 257; Pls.' Mem. at 64.)  Although proof of scienter is unnecessary under § 349, "[a] *prima facie* case requires . . . a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way . . . ."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. 1995).  Thus, regardless of whether a claim under § 349 is predicated on a "representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Stutman*, 95 N.Y.2d 29 (internal quotation omitted)).

Plaintiffs assert that Defendants' statements were

> designed to mislead consumers into believing that they had much more than an "[arms]-length" relationship with the Defendant Firms; to convince clients that the [Cash Sweep Programs] were beneficial to them; and to conceal that, in fact, the [Cash

Sweep Programs] were designed to create windfall profits for Defendants at their clients' expense.

(Pls.' Mem. at 64-65.)   However, Plaintiffs have failed to identify any materially misleading misstatements or omissions by Defendants that support these contentions. *See supra* Part II.B.3.c.   In the absence of such allegations, a cause of action under § 349 cannot be maintained.   *See Shovak v. Long Island Commercial Bank*, 858 N.Y.S.2d 660, 662-63 (2d Dep't 2008) (dismissing a § 349 claim because "there was no materially misleading statement, as the record indicated that the yield spread premium, which is not *per se* illegal, was fully disclosed to the plaintiff").   Accordingly, Plaintiffs' § 349 claim is dismissed.

### 8.   Breach of Contract Against the Brokerage Defendants

In their breach of contract claim, Plaintiffs allege that the Brokerage Defendants breached the implied covenant of good faith and fair dealing. (*See* SAC ¶¶ 271, 273; Pls.' Mem. at 57.) Although Plaintiffs fail to identify the specific contracts to which they are referring, much less the provisions of the agreements on which they rely, Plaintiffs' theory of this claim appears to be that these unidentified contracts did "not authorize Defendants to reap windfall profits at their clients' expense" because they were "silent as to both the magnitude of Defendants' windfall profits and to how those profits were to be obtained . . . ." (Pls.' Mem. at 59.)

However, as discussed above, *see, e.g.*, *supra* Part II.B.3.c.(2), Plaintiffs cannot prevail on a legal theory that is based on their alleged surprise that Defendants used free

credit balances to earn a profit.   Plaintiffs have also failed to point to any provision of an agreement that could plausibly give rise to an expectation on their part that Defendants were somehow subject to a limitation on the amount of profits that they were allowed to make in connection with the Cash Sweep Programs.   Similarly, Plaintiffs have not identified any agreement that could support a reasonable expectation that Defendants were obligated to maximize Plaintiffs' earnings on *uninvested* funds in their brokerage accounts. Therefore, Plaintiffs have failed to state a claim based on a theory of a breach of the implied covenant of good faith and fair dealing.   Accordingly, this claim is dismissed.

### a.   Applicable Law

"'[U]nder New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance.'" *Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, No. 08 Civ. 1327 (RJS), 2009 WL 735072, at *13 (S.D.N.Y. Mar. 20, 2009) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).   "In particular, the covenant includes a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007) (quoting *Dalton v. Educ. Testing Serv.*, 639 N.Y.S.2d 977, 979 (N.Y. 1995)).   Thus, "[t]o state a cause of action for breach of the implied covenant of good faith and fair dealing, 'the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff.'" *Dweck Law Firm, L.L.P. v. Mann*, 340 F.

Supp. 2d 353, 358 (S.D.N.Y. 2004) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (2d Dep't 1999)).

b. Analysis

Plaintiffs summarize the theory of their breach of contract claim as follows:

> Defendants' breach of the implied covenant of good faith is alleged as the basis for the breach of contract [claim] because no client would ever in good faith believe that it is justified for the Defendants to deploy the [Cash Sweep Programs] in such a manner that they would derive massive ill-gotten windfall profits at their clients' expense . . . .

(Pls.' Mem. at 58.) The "expense" to which Plaintiffs refer is apparently the difference between the interest that they actually earned, and the returns that they believe they would have been earned if they had chosen to invest their free credit balances in money market mutual funds or other investments. (*See id.*)

Plaintiffs' argument fails on its own terms. With respect to this claim, the issue is whether Defendants breached the obligation to act in good faith that is implied in every contract governed by New York law, not whether Plaintiffs "believe[d]" (Pls.' Mem. at 58) — in good faith or otherwise — that Defendants' profit-seeking behavior was inappropriate. *See Tractebel Energy Mktg.*, 487 F.3d at 98. Defendants did not violate the implied covenant of good faith and fair dealing "by acting in [their] own self-interest consistent with [their] rights under a contract." *Suthers v. Amgen Inc.*, 441 F.

Supp. 2d 478, 485 (S.D.N.Y. 2006). As stated above, "the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money." *Levitin*, 159 F.3d at 703. Therefore, the Brokerage Defendants did not breach the agreements governing Plaintiffs' accounts simply by seeking to maximize their profits.

Moreover, Plaintiffs have not identified a contractual provision that could be interpreted to give rise to a belief that the "fruits of the contract," *Dalton*, 639 N.Y.S.2d at 979, included a limitation on the profits that Defendants could earn through the use of Plaintiffs' free credit balances. *See Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91 Civ. 1816, 92 Civ. 5283 (MBM), 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993) ("[A] complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated."); *see also Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837 (HB), 2006 WL 399396, at *10-11 (S.D.N.Y. Feb. 11, 2006). Nor does the SAC suggest that the Brokerage Defendants undertook any contractual obligation to maximize Plaintiffs' earnings on their uninvested free credit balances. *See, e.g., EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 22 (N.Y. 2005) (affirming the dismissal of a claim for breach of the implied covenant of good faith and fair dealing where "[t]he complaint does not adequately allege that [the defendant] injured [the plaintiff's] right to receive the benefits of their agreement"). Although Plaintiffs argue in their opposition papers that the Brokerage Defendants possessed discretion over the brokerage accounts that was to be exercised in Plaintiffs' best interest (*see, e.g.*, Pls.' Mem.

at 58), the SAC contains nothing more than conclusory allegations to that effect. (*See* SAC ¶ 271 ("Among the Brokerage Defendants' obligations to their customers were to act in their interests in taking discretionary actions with their accounts . . . .").) Brokers, acting as such, owe no such duty to clients with nondiscretionary brokerage accounts. *See Kwiatkowski*, 306 F.3d at 1302 ("The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments.").[17] And, although Defendants may have made investment advisory services available to their customers, Plaintiffs have not alleged that they sought or received such services. *See supra* Part II.B.2. Simply put, in the absence of a contractual duty, Plaintiffs' allegations are insufficient to state a claim that a breach occurred.

Finally, Plaintiffs argue that the "contracts were defective from the outset since they were implemented largely through negative consent, which was not meaningful consent at all." (Pls.' Mem. at 60.) However, Defendants disclosed to their customers that the Cash Sweep Programs' features could be modified unilaterally through advance written notice of the modifications that would become effective on a later date. (*See* Pls.' Merrill Lynch Decl. Ex. 8 at 5; Cantor Decl. Ex. C at 10, Ex. D at 24 (Morgan Stanley); Pls.' Citigroup Decl. Ex. 9 at 5; Pls.' Charles Schwab Decl. Ex. 14 at 5; Pls.' Wachovia Decl. Ex. 12 at 1, 7.) Moreover, the NYSE Information Memo upon which Plaintiffs rely as an "indicia" of a contract breach by Defendants expressly stated that "[w]ith regard to existing sweep programs, it is not intended that member organizations which secured prior consent and made effective subsequent disclosure secure affirmative consent for such programs." (NYSE Info. Memo at 2 n.2.)[18] Therefore, the use of negative consent to modify the Cash Sweep Programs did not, in and of itself, breach the contracts underlying Plaintiffs' brokerage accounts.

The implied covenant of good faith and fair dealing "does not 'add [ ] to the contract a substantive provision not included by the parties.'" *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (S.D.N.Y. 2005) (quoting *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993)). Since Plaintiffs have not identified any contract-based expectation — implied or otherwise —

---

[17] Contrary to Plaintiffs' assertion, the Rules and Regulations promulgated by the NYSE and the NASD do not broaden the scope of the Brokerage Defendants' contractual duties, implied or otherwise. First, as Plaintiffs acknowledge, SROs' rules cannot serve as the basis for a private cause of action. *See, e.g., SSH Co., Ltd. v. Shearson Lehman Bros. Inc.*, 678 F. Supp. 1055, 1058 (S.D.N.Y. 1987). Second, even "when those regulatory rules are incorporated into a customer agreement, they do not bring with them a right to sue for an infraction." *Gurfein v. Ameritrade, Inc.*, No. 04 Civ. 9526 (LLS), 2007 WL 2049771, at *3 (S.D.N.Y. July 17, 2007), *aff'd* 2009 WL 485062 (2d Cir. Feb. 27, 2009). Therefore the SRO pronouncements cited by Plaintiffs do not bolster their breach of contract claim.

[18] The SEC's proposed changes to its regulations regarding the use of customers' free credit balances adopt the NYSE's view: "To minimize the burden on the broker-dealer, [the proposed Rule 15c3-3] would not require the broker-dealer to obtain [an existing] customer's previous agreement to permit the broker-dealer to switch the sweep option between money market fund products and bank deposit account products." *See* Amendments to Financial Responsibility Rules for Broker-Dealers, 72 Fed. Reg. 12,862, 12,867 (proposed Mar. 19, 2007).

that was harmed by the implementation of Defendants' Cash Sweep Programs or the profits allegedly earned by Defendants, Plaintiffs' breach of contract claim must be dismissed.

### 9.  Unjust Enrichment

In their unjust enrichment claim, Plaintiffs allege that Defendants paid their customers lower rates of interest on free credit balances deposited at Sweep Banks, and enriched themselves by using those funds to generate profits. (*See* SAC ¶ 301.) For the reasons stated below, the Court concludes that this theory is insufficient to adequately plead a claim for unjust enrichment.

#### a.  Applicable Law

An unjust enrichment claim "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 2009 WL 774351, at *4 (N.Y. Mar. 26, 2009). Therefore, "[u]nder New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001).

"Courts have not allowed claims for unjust enrichment, however, where there is a valid and enforceable written contract governing the subject matter of the dispute." *Kottler*, 607 F. Supp. 2d at 467. "On the other hand, where 'there is a *bona fide* dispute as to

the existence of a contract or where the contract does not cover the dispute in issue, [a party] may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies.'" *CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (quoting *Leroy Callender, P.C. v. Fieldman*, 676 N.Y.S.2d 152, 153 (1st Dep't 1998)).

#### b.  Analysis

For the purpose of assessing Plaintiffs' unjust enrichment claim, the Court assumes, *arguendo*, that Plaintiffs have raised a sufficient challenge to the contractual agreements governing their retail brokerage accounts to permit them to plead an unjust enrichment claim in the alternative. *See, e.g.*, *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 2667 (LMM), 2008 WL 4866054, at *11 (S.D.N.Y. Nov. 6, 2008). However, Plaintiffs have not presented sufficient allegations to support a claim for unjust enrichment.

Specifically, Plaintiffs provide no factual basis for their conclusory allegation that "Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiffs . . . by collecting money to which [Defendants] are not entitled." (SAC ¶ 301.) Instead, their unjust enrichment claim appears to be based on the *correlation* between (1) the reduced rates of interest they allegedly received in the Modified and Tiered Cash Sweep Programs, and (2) Defendants' increased profits as a result of the implementation of these Programs.

However, more of a nexus is required between a defendant's "enrichment" and a plaintiff's "expense" to plead a plausible claim to relief on a theory of unjust

enrichment. *See Gurvey v. Cowan, Liebowitz & Latman, PC.*, No. 06 Civ. 1202 (BSJ), 2009 WL 1117278, at *8 (S.D.N.Y. Apr. 24, 2009) ("Plaintiff has provided only assertion and speculation as to the benefit that was taken from her by [the] [d]efendants. Even under the low threshold that plaintiffs must meet under Rule 12(b)(6), the unjust enrichment claim must be dismissed . . . ."); *cf. Bridgeway Corp. v. Citibank, N.A.*, Nos. 97 Civ. 8884, 00 Civ. 3598 (DC), 2003 WL 402790, at *4 (S.D.N.Y. Feb. 20, 2003) (finding implausible a theory of compensatory damages based on the argument that "a bank and a depositor would have contemplated . . . that if there were a problem in the return of the funds, the depositor would be able to recover for profits it could have made if it had had the use of the funds"). Plaintiffs do not allege that Defendants' actions caused losses, in real terms, to the value of the principal amount of their free credit balances. Nor do Plaintiffs contend that Defendants induced them to deposit their free credit balances at affiliated Sweep Banks but then delayed or refused to return those funds upon request. Lastly, Plaintiffs acknowledge that they *did* receive at least some compensation for these uninvested funds, in the form of a positive rate of interest. (*See* SAC ¶¶ 30-36.) Therefore, Plaintiffs' factual allegations fail to support a plausible inference that Defendants' were enriched at Plaintiffs' expense.

Plaintiffs have also failed to offer any factual allegations to support an inference that "equity and good conscience" require that Defendants pay them a share of the profits that they earned from the use of free credit balances. *Golden Pac. Bancorp*, 273 F.3d at 519. Plaintiffs essentially argue that they did not earn as much of a return on their *uninvested funds* as they believe they that

should have. Such an allegation is insufficient to demonstrate an equitable entitlement to a share of the profits earned by Defendants through disclosed uses of Plaintiffs' free credit balances. *See Smith v. Chase Manhattan Bank, USA, N.A.*, 741 N.Y.S.2d 100 (2d Dep't 2002) (dismissing unjust enrichment claim where "[t]here [was] no allegation that the benefits received were less than what [the plaintiffs] bargained for"). Plaintiffs have failed to sufficiently allege that Defendants' use of the Cash Sweep Programs was deceptive, and they have not identified any materially misleading statements or omissions by Defendants in connection with these Programs. Moreover, to repeat, "the practice of a financial institution using money deposited with it to obtain earnings is *neither unknown nor unexpected, much less nefarious*." *Levitin*, 159 F.3d at 703 (emphasis added). Therefore, the Court concludes that Plaintiffs have failed to plead a sufficient nexus between Defendants' profits and their alleged losses, and they have not identified circumstances suggesting that equitable considerations entitle them to a share of Defendants' profits. Accordingly, Plaintiffs' unjust enrichment claim is dismissed.

### C. Leave to Amend

The final footnote of Plaintiffs' 117-page brief in opposition to Defendants' motions states, in its entirety:

> In the event that the Court dismisses any of the claims in whole or in part, Plaintiffs respectfully request an opportunity to replead since this is the first pleading to be reviewed by the Court in this matter.

46

(Pls.' Mem. at 117 n.112 (citing, *inter alia*, Fed. R. Civ. P. 15(a)).)

"While [Rule] 15(a) provides that leave to amend 'shall be freely given when justice so requires,' the Court has broad discretion in deciding whether or not to grant such a request." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 06 Civ. 12967 (PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Factors that are relevant to the exercise of the Court's discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile. *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d at 523-24. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Some courts in this District have required that a plaintiff file a copy of the proposed amended pleading in order to demonstrate that Rule 15(a) relief is appropriate. *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 2589482, at *4 (S.D.N.Y. Sept. 8, 2007) ("In the context of a motion to amend, Rule 7(b) . . . requires the movant to supply a copy of the proposed amendment."); *Bankr. Trust of Gerard Sillam v. REFCO Group, LLC*, No. 05 Civ. 10072 (GEL), 2006 WL 2129786, at *5 (S.D.N.Y. July 28, 2006); *Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993). At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a). *See, e.g.*, *Horoshko v. Citibank,*

*N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) ("Because an amendment is not warranted '[a]bsent some indication as to what [the plaintiffs] might add to their complaint in order to make it viable,' the District Court was under no obligation to provide the [plaintiffs] with leave to amend their complaint . . . ." (quoting *Nat'l Union of Hosp. & Health Care Emp., RWDSU, AFL-CIO v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977))); *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1132 (2d Cir. 1994). In sum, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004).

Plaintiffs' five-line footnote falls far short of these standards. Rule 15(a) is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion. Plaintiffs have filed two amended pleadings in this matter, and they have not made any attempt to demonstrate that they are entitled to file a third. Therefore, the Court concludes that amending the SAC, as proposed, would be futile. Accordingly, Plaintiffs' request for leave to amend the SAC is denied.

III. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted. The Clerk of the Court is respectfully directed to terminate the motions docketed as document numbers 48, 52, 56, 60 and 62, and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

***

Dated:  July 27, 2009
           New York, New York

Plaintiffs are represented by Joel Paul
Laitman, Ashley H. Kim, Jay Paul Saltzman,
Robert Chira, and Samuel P. Sporn,
Schoengold Sporn Laitman & Lometti, P.C.,
19 Fulton Street, New York, New York
10038. The Merrill Lynch Defendants are
represented by Jay B. Kasner and Scott D.
Musoff, Skadden, Arps, Slate, Meagher &
Flom LLP, Four Times Square, New York,
New York 10036.     The Morgan Stanley
Defendants are represented by Allen W.
Burton, Bradley Jay Butwin, and Daniel
Lucas Cantor, O'Melveny & Myers LLP, 7
Times Square, New York, New York 10036.
The Citigroup Defendants are represented by
Andrew W. Stern and Alfred Robert Pietrzak,
Sidley Austin LLP, 787 Seventh Avenue,
New York, New York 10019.  The Charles
Schwab Defendants are represented by
Kenneth Ian Schacter and Theo J. Robins,
Bingham McCutchen LLP, 399 Park Avenue,
New York, New York 10022. The Wachovia
Defendants are represented by Michael
Terrance Conway, Cameron S. Matheson,
James A. Murphy, LeClair Ryan, P.C., 830
Third Avenue, Fifth Floor, New York, New
York 10022.